**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Vincent Franklin BENNETT,**
**Defendant–Appellant.**

No. 02–50442.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 10, 2003.

Filed April 9, 2004.

Martha M. Hall, DiIorio & Hall, San Diego, CA, for the defendant-appellant.

Carol C. Lam, United States Attorney, Michael F. Kaplan, United States Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Before: FISHER and BYBEE, Circuit Judges, and MAHAN, District Judge.*

FISHER, Circuit Judge:

This case arises from the boarding and search of defendant-appellant Vincent Franklin Bennett's boat by members of a joint task force targeting smuggling activity from Mexico into Southern California. Coronado Police Officer Keith James initially spotted Bennett's boat near the U.S.-Mexico border on January 27, 2000, as the boat traveled north along the California coastline. Officer Sandy Joseph Sena, another task force member, boarded Bennett's boat at the entrance to San Diego Bay and eventually directed Bennett to dock his boat.

After the docking, members of the task force made multiple efforts over many hours to find drugs on Bennett's boat. When drilling three or four holes in the boat proved unproductive, they stored the boat overnight, hauled it to a Coast Guard facility the next day and x-rayed it. The x-ray revealed what turned out to be 1,541.5 pounds of marijuana.

Bennett was convicted on one count of importation of marijuana under 21 U.S.C. §§ 952 and 960, and one count of possession with intent to distribute marijuana under 21 U.S.C. § 841(a)(1). He was sentenced to 121 months of imprisonment for

each count, to be served concurrently. At a pretrial hearing before District Judge Enright, the court denied Bennett's motions to suppress the fruits of the search of his boat and statements Bennett claimed were taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Bennett appeals those determinations, as well as evidentiary rulings and sentencing determinations that occurred during trial and sentencing, which were presided over by District Judge Real. We conclude that the marijuana on Bennett's boat was seized pursuant to a valid border search, and therefore affirm his possession conviction. However, we conclude that improperly admitted testimony at trial requires reversal of Bennett's importation conviction. We also remand for resentencing.

**I.**

Officer James was the first task force member to see Bennett's boat. James was positioned on Point Loma, which is on the far west end of Coronado, a peninsula that juts out into the Pacific Ocean from the San Diego area. From Point Loma, James trained his high grade binoculars toward the U.S.-Mexico border. He never actually saw Bennett's boat cross the border. Rather, James first spotted the boat south of the Imperial Beach pier, north of the border. The boat was heading north, traveling quickly and hugging the coastline. James notified other members of the task force when the boat reached the entrance to San Diego Bay, in accordance with the task force's regular procedure for boats spotted near the border.

Officer Sena of the U.S. Coast Guard received James' call about Bennett's boat and led a team aboard at the entrance to

* The Honorable James C. Mahan, United States District Judge for the District of Nevada, sitting by designation.

San Diego Bay. Sena intended to ensure compliance with federal regulations for the vessel's size and type. Once on board, Sena encountered two peculiarities. First, the boat registration number on the paperwork Bennett provided did not match the number on his boat. When told of this discrepancy, Bennett stated that he owned two very similar boats and had mixed up the paperwork. Second, Sena learned of an outstanding state warrant for Bennett's arrest. Sena then directed Bennett to take his vessel to the police dock where, he told Bennett, boarding would continue.

While en route to the police dock, Sena encountered additional peculiarities on Bennett's boat. The boat was riding low in the water, so much so that its swim platform was submerged. It also had a new, high performance engine and some space for which Sena could not account. Upon arrival at the police dock, Sena confirmed the warrant for Bennett's arrest and then turned him over to a harbor police officer. As Bennett was taken away for further questioning, officers began a thorough search of his boat that would eventually culminate in the discovery of the marijuana stashed aboard.

Bennett filed a pretrial motion to suppress the marijuana, arguing that various aspects of the search violated his Fourth Amendment rights. After an evidentiary hearing, Judge Enright denied Bennett's motions, finding that the search was justified as a border search because of the peculiarities Sena observed. We review de novo a district court's determination of the legality of a search. *See United States v. Tarazon*, 989 F.2d 1045, 1048 (9th Cir. 1993).[1]

## A.

▇▇▇ We first consider whether the border search doctrine applies to this case. The government has broad authority to conduct searches of vessels at the functional equivalent of the border, but only if its agents are reasonably certain that a vessel and its contraband contents have crossed the border. *See United States v. Dobson*, 781 F.2d 1374, 1376 (9th Cir.1986); *United States v. Espericueta Reyes*, 631 F.2d 616, 619 (9th Cir.1980). The "reasonably certain" standard is higher than a probable cause standard, *see United States v. Kessler*, 497 F.2d 277, 279 (9th Cir.1974), but agents need not have observed a vessel cross the border in order to be reasonably certain that it did, *see Dobson*, 781 F.2d at 1376.

▇▇▇ The initial stop of Bennett's boat occurred at the entrance to San Diego Bay. We have previously held that if law enforcement officials are reasonably certain that a vessel sailed from outside U.S. territorial waters, then a search of that vessel at a U.S. dock or in U.S. waters is considered to be at the functional equivalent of the border.[2] *Dobson*, 781 F.2d at 1377 & n. 4. That is the circumstance here. Although no agent was *actually* certain that Bennett crossed the border, spotting

1. The government argues that our review of the search should be limited because Bennett did not specifically contest the initial stop and inspection before the district court. *See United States v. Riley*, 335 F.3d 919, 925 (9th Cir.2003). However, the district court actually ruled that the search was a border search and that border search principles justified the extended detention and search. We therefore review these issues de novo. *Cf. Felix v. McCarthy*, 939 F.2d 699, 701 (9th Cir.1991)

(deciding issue was preserved for appellate review when referenced in defendants' motion for summary judgment and considered by the district court).

2. United States territorial waters include a 12–nautical–mile strip of ocean extending from the coastline. *United States v. Cabaccang*, 332 F.3d 622, 625 n. 6 (9th Cir.2003) (en banc) (citing Proclamation No. 5928, 54 Fed.Reg. 777 (Dec. 27, 1988)).

a boat heading north from the direction of Mexico, hugging the coastline, supports finding a *reasonable* certainty of a border crossing. *See United States v. Potter,* 552 F.2d 901, 907 (9th Cir.1977) (holding absolute certainty is not required). Therefore, because the entrance to San Diego Bay is in U.S. territorial waters, the search of Bennett's boat occurred at the functional equivalent of the border. A contrary conclusion would hinder sensible border patrol efforts, because vessels travel quickly and in paths not delineated by roads or visible borders. *See United States v. Tilton,* 534 F.2d 1363, 1365 (9th Cir.1976) ("[I]t is not practical to set up checkpoints at the outer perimeters of the territorial waters."). Here, although James could not see Bennett's boat cross the imaginary demarcation line between the United States and Mexico, his vantage point on the western-most tip of Coronado enabled him to be reasonably certain that the boat he saw came from Mexican waters. Because "the stop occurred at the functional equivalent of a border[ ] and was supported by a firm belief that [Bennett's boat] had come from [Mexican] waters," the border search doctrine applies. *Dobson,* 781 F.2d at 1377.

### B.

■ We next consider whether the border search doctrine justifies the search the officers conducted. Recently, the Supreme Court held that the government may conduct a suspicionless border search of a car's gas tank, explaining that most border searches involving vehicles do not require any articulable level of suspicion. *United States v. Flores–Montano,* —— U.S. ——, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004). "[T]he reasons that might support a requirement of some level of suspicion in

the case of highly intrusive searches of the person—dignity and privacy interests of the person being searched—simply do not carry over to vehicles." *Id.* at ——, 124 S.Ct. 1582. Especially destructive searches of property, however, may require reasonable suspicion. *See id.* at ——, 124 S.Ct. 1582 ("While it may be true that some searches of property are so destructive as to require a different result, [the search of the gas tank in Flores–Montano's car] was not one of them."). Extended border searches, which occur well after an actual entry and therefore intrude more on an individual's normal expectation of privacy, do require reasonable suspicion. *See United States v. Alfonso,* 759 F.2d 728, 734 (9th Cir.1985) (upholding under extended border search analysis the search of a boat some 36 hours after it crossed the border).

■ Even assuming that the search of Bennett's boat was especially destructive or extended—and therefore arguably unconstitutional absent reasonable suspicion—it was permissible under the Fourth Amendment.[3] In reaching the same conclusion at the pretrial hearing, Judge Enright relied on the officers' observations of:

> the disparity and the spacial confirmation and configuration of the vessel, the defendant's inconsistent story, the fact that the [boat's] identification numbers did not correspond with the papers that were presented to the officials and the fact that the boat did show that it was riding low in the water under various circumstances which were specifically described by the witnesses.

The record supports these findings, which constitute reasonable suspicion. *See, e.g.,*

---

**3.** *Flores–Montano* explicitly left open the question of whether exploratory drilling searches of vehicles must be supported by reasonable suspicion. —— S.Ct. at —— n. 2. Because we conclude that the search of Ben-

nett's boat was in fact supported by reasonable suspicion, we do not decide whether reasonable suspicion was required to support the drilling of holes in his boat.

*Bravo,* 295 F.3d at 1008. Therefore, the district court properly denied Bennett's motion to suppress the evidence found in his boat.[4]

## II.

Although the legality of the border search justifies Bennett's conviction for possession under 21 U.S.C. § 841, it does not dispose of Bennett's challenge to his illegal importation conviction under 21 U.S.C. §§ 952, 960. Illegal importation occurs when a defendant imports a controlled substance into the United States from "any place outside thereof." 21 U.S.C. § 952(a); *see United States v. Cabaccang,* 332 F.3d 622, 625–32 (9th Cir. 2003) (en banc).

Here, although Bennett's boat was heading north (away from Mexico) when officers first spotted it, the boat was in U.S. waters at the time. Thus, the government on appeal relies chiefly on three other items of evidence that Bennett imported drugs from outside the United States. First, U.S. Customs Officer Malcolm McCloud Chandler testified that he discovered a global positioning system ("GPS") while searching Bennett's boat and that the GPS revealed that Bennett's boat had traveled from Mexican waters to San Diego Bay. Second, during his testimony, Chandler indirectly introduced Bennett's admission that he had been navigating in Mexican waters looking for scuba-diving sites. Third, a jailmate of Bennett's testified that Bennett told him that he had been arrested for transporting drugs from Mexico, which he used to do several times per week. Bennett claims that the admission of Chandler's GPS-related testimony violated the rules of evidence and that the

introduction of his statement to Chandler violated his *Miranda* rights. He does not contest the admissibility of his jailmate's testimony.

## A.

Bennett's most serious challenge to the evidence supporting his importation conviction relates to Chandler's testimony about the global positioning system he discovered during his search of Bennett's boat. A GPS device uses global positioning satellites to track and record the location of the device and, therefore, the location of any object to which it is attached. The GPS came with a "backtrack" feature that graphed the boat's journey that day. Chandler testified that the backtrack feature mapped Bennett's journey from Mexican territorial waters off the coast of Rosarito, Mexico, to the Coronado Islands and then north to San Diego Bay. Less significantly, Chandler also retrieved "way points"—navigational points programmed into the GPS to assist the captain in navigating to a particular destination. Chandler testified that within the previous year, someone had programmed way points into the GPS that included points in Mexican waters. Chandler acknowledged on cross-examination that he had not taken possession of the GPS device itself or obtained any record of the data contained therein.

■ At trial, the district court overruled Bennett's foundation, best evidence rule and hearsay objections to this testimony, along with his request for a side bar conference. We review these evidentiary rulings for abuse of discretion. *See United States v. Parks,* 285 F.3d 1133, 1138 (9th Cir.2002).

---

4. The government also claims that the stop and search of Bennett's boat were justified pursuant to a document inspection under 19 U.S.C. § 1581(a). For his part, Bennett argues that U.S. Customs lacked authority un-

der 19 U.S.C. § 1594 to search his boat after seizing it. In light of our conclusion that the search was a valid border search, we do not address these arguments.

The best evidence rule provides that the original of a "writing, recording, or photograph" is required to prove the contents thereof. Fed.R.Evid. 1002. A writing or recording includes a "mechanical or electronic recording" or "other form of data compilation." Fed.R.Evid. 1001(1). Photographs include "still photographs, X-ray films, video tapes, and motion pictures." Fed.R.Evid. 1001(2). An original is the writing or recording itself, a negative or print of a photograph or, "[i]f data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately." Fed.R.Evid. 1001(3).

■■■ Where the rule applies, the proponent must produce the original (or a duplicate, see Fed.R.Evid. 1003) or explain its absence. Fed.R.Evid. 1002, 1004. The rule's application turns on "whether contents are sought to be proved." Fed. R.Evid. 1002 Advisory Committee's note. "[A]n event may be proved by nondocumentary evidence, even though a written record of it was made." *Id.* Accordingly, the rule is inapplicable when a witness merely identifies a photograph or videotape "as a correct representation of events which he saw or of a scene with which he is familiar." *Id.; see also United States v. Workinger,* 90 F.3d 1409, 1415 (9th Cir. 1996) ("[A] tape recording cannot be said to be the best evidence of a conversation when a party seeks to call a participant in or observer of the conversation to testify to it. In that instance, the best evidence rule has no application at all."). However, the rule does apply when a witness seeks to testify about the contents of a writing, recording or photograph without producing the physical item itself—particularly when the witness was not privy to the

events those contents describe. *See* Fed. R.Evid. 1002 Advisory Committee's note.

■■■ That is the nature of Chandler's GPS testimony here and why his testimony violated the best evidence rule. First, the GPS display Chandler saw was a writing or recording because, according to Chandler, he saw a graphical representation of data that the GPS had compiled about the path of Bennett's boat. *See* Fed.R.Evid. 1001(1). Second, Chandler never actually observed Bennett's boat travel the path depicted by the GPS.[5] Thus, Chandler's testimony concerned the "content" of the GPS, which, in turn, was evidence of Bennett's travels. Fed.R.Evid. 1002. At oral argument, the government admitted that the GPS testimony was offered solely to show that Bennett had come from Mexico. Proffering testimony about Bennett's border-crossing instead of introducing the GPS data, therefore, was analogous to proffering testimony describing security camera footage of an event to prove the facts of the event instead of introducing the footage itself.

This is precisely the kind of situation in which the best evidence rule applies. *See, e.g., L.A. News Serv. v. CBS Broad., Inc.,* 305 F.3d 924, 935 (9th Cir.2002) ("We think that Fox's report of what he saw on the label ... was inadmissible under the best evidence rule."), *amended by* 313 F.3d 1093 (9th Cir.2002); *see also* 14 Am.Jur. Proof of Facts 2d 173 § 14 (1977) ("The reported cases show that proponents of computer-produced evidence occasionally founder on the best evidence rule by presenting oral testimony based on the witness' review of computer printouts without actually introducing the printouts them-

---

5. Nor did Chandler observe Bennett or anyone else enter way points into the machine. *See Pahl v. Comm'r of Internal Revenue,* 150 F.3d 1124, 1132 (9th Cir.1998) (holding that court did not abuse its discretion in accepting duplicate over best evidence rule objection because document's signature had been witnessed).

selves into evidence.") (citing *State v. Springer*, 283 N.C. 627, 197 S.E.2d 530 (N.C.1973)). Yet the government did not produce the GPS itself—or a printout or other representation of such data, *see* Fed. R.Evid. 1001(3)—which would have been the best evidence of the data showing Bennett's travels. Instead, the government offered only Chandler's GPS-based testimony about an event—namely, a border-crossing—that he never actually saw.

"[O]ther evidence" of the contents of a writing, recording or photograph is admissible if the original is shown to be lost, destroyed or otherwise unobtainable. Fed.R.Evid. 1004. But the government made no such showing. When asked on cross-examination to produce the GPS or its data, Chandler simply stated that he was not the GPS's custodian. He further testified that "there was no need to" videotape or photograph the data and that he

had nothing other than his testimony to support his assertions about the GPS's contents. Moreover, the government has not offered any record evidence that it would have been impossible or even difficult to download or print out the data on Bennett's GPS.[6] On the record before us, the government is not excused from the best evidence rule's preference for the original. We therefore hold that Chandler's GPS-based testimony was inadmissible under the best evidence rule.[7]

## B.

When an error is not constitutional in magnitude, as in the admission of Chandler's GPS-based testimony, we will consider the error to be prejudicial unless it is more probable than not that the error did not materially affect the verdict. *See United States v. Seschillie*, 310 F.3d 1208,

6. Furthermore, a survey of other GPS cases (not involving the best evidence rule) suggests that outputting the data from Bennett's GPS may have been possible. *See State v. Jackson*, 150 Wash.2d 251, 76 P.3d 217, 221 (2003) ("Use of the GPS devices allowed the vehicles' positions to be precisely tracked when data from the devices was downloaded"); *State v. Pirsig*, 670 N.W.2d 610, 613 (Minn.Ct. App.2003) ("The data collected from the GPS monitor can be downloaded onto a Geographic Information System (GIS) software application. The GIS takes the location data from the GPS and overlays it onto a map...."); *People v. Sullivan*, 53 P.3d 1181, 1184 (Colo. Ct.App.2002) ("[T]he chip from the GPS device was installed and removed more than once.... [The defendant] admitted that he downloaded information from the device on at least two occasions. In order to retrieve the information, the chip in the device would have had to have been removed and replaced.").

7. We need not resolve Bennett's other objections to the admission of Chandler's GPS testimony. *See L.A. News Serv.*, 305 F.3d at 935–36 & nn. 7–8 (deciding not to address hearsay argument where evidence was inadmissible under the best evidence rule). We do note, however, that in addition to failing to produce

the GPS or its output for trial, the government did not establish that Bennett's GPS information was necessarily accurate or that the GPS itself worked properly. *See* 14 Am. Jur. Proof of Facts 2d 173 § 17 (1977) ("The most common reason that courts have rejected computerized evidence is that an insufficient foundation was laid to show the accuracy and trustworthiness of the evidence."); *cf. United States v. De Georgia*, 420 F.2d 889, 893 n. 11 (9th Cir.1969) ("While ... it is immaterial that the business record is maintained in a computer rather than in company books, this is on the assumption that: (1) the opposing party is given the same opportunity to inquire into the accuracy of the computer and the input procedures used, as he would have to inquire into the accuracy of written business records, and (2) the trial court, as in the case of challenged business records, requires the party offering the computer information to provide a foundation therefor sufficient to warrant a finding that such information is trustworthy."). Moreover, malfunctioning GPS devices are not unknown to this court. *See United States v. McIver*, 186 F.3d 1119, 1123 (9th Cir.1999) (discussing a GPS that malfunctioned after three days of use).

1214 (9th Cir.2002). Here, we conclude that the error was indeed prejudicial.

■ Putting aside Chandler's GPS-based testimony, the other items of evidence the government cites in support of the importation conviction are not overwhelming. First, Chandler obliquely referred to Bennett's having been in Mexican waters to scuba dive. Specifically, when asked whether finding scuba-diving equipment on Bennett's boat struck him as unusual, Chandler testified that it seemed odd for someone to scuba dive alone in Mexican waters. Even assuming that this testimony did not violate Bennett's *Miranda* rights, Chandler never actually testified that Bennett had admitted navigating Mexican waters.[8] Moreover, the government did not even argue Chandler's scuba-related testimony to the jury as evidence of importation. Second, the jailmate's testimony that Bennett admitted transporting drugs from Mexico is equally problematic. Bennett's jailmate was a multiply convicted felon who admitted on cross-examination that he hoped his testimony against Bennett would earn him a reduced sentence for a recent conviction. Third, the government points to other evidence that only circumstantially suggests that Bennett imported the marijuana from Mexico—specifically, that his boat was first spotted near Mexican waters and that he was carrying Mexican pesos with him on the boat. Taken together, these items of evidence are not so compelling that the jury would likely have found importation even without Chandler's GPS-based testimony.

More importantly, there is compelling evidence that the jury in fact relied on the GPS-based testimony to conclude that Bennett imported marijuana from Mexico. During its deliberations, Bennett's jury asked the court about the GPS data and Chandler's GPS-based testimony. In response, the court ordered a read back of the GPS-related portions of Chandler's testimony. Shortly thereafter, the jury returned with a guilty verdict.

On this record, we cannot say the erroneous admission of Chandler's GPS testimony was more probably than not immaterial to the jury's verdict. We hold, accordingly, that Bennett was prejudiced by the erroneous admission of the GPS testimony and that, although his possession conviction survives this appeal, his importation conviction does not.

### III.

■ Bennett contends that the manner in which the district court imposed his sentence violated Rule 32 of the Federal Rules of Criminal Procedure. We do not reach Bennett's sentencing claim because, having concluded that only one of Bennett's two counts of conviction survives, we vacate his entire sentence:

> When a defendant is sentenced on multiple counts and one of them is later vacated on appeal, the sentencing package comes "unbundled." The district court then has the authority " 'to put together a new package reflecting its considered judgment as to the punishment the defendant deserve[d] for the crimes of which he [wa]s still convicted.' "

*United States v. Ruiz–Alvarez*, 211 F.3d 1181, 1184 (9th Cir.2000) (quoting *United States v. McClain*, 133 F.3d 1191, 1193 (9th Cir.1998) (further citations omitted)); *see also United States v. Jenkins*, 884 F.2d 433, 441 (9th Cir.1989) (remanding for resentencing on unchallenged count where district court may have "regarded the sentences for the two counts as parts of a single 'sentencing package' ") (citing *United States v. Pinkney*, 551 F.2d 1241, 1246

---

8. In light of our prejudice analysis, we do not reach Bennett's *Miranda* claim.

n. 37 (D.C.Cir.1976) ("Where the appellate court could only speculate as to what sentence the trial court would have imposed absent consideration of a count upon which the conviction or sentence is later vacated, a remand for resentencing on the remaining, valid counts is appropriate.")).

Here, the district court did not differentiate among Bennett's counts of conviction during sentencing and ultimately sentenced Bennett to 121 months imprisonment "as to each count, concurrent." Because we are affirming one of Bennett's counts of conviction and reversing the other, Bennett's sentence has become "unbundled," and he must be resentenced.

Importation conviction **REVERSED,** possession conviction **AFFIRMED,** all sentences **VACATED** and case **RE-MANDED** for further proceedings consistent with this opinion.