# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00601-CR

**Jose Godinez Matute, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
NO. D-1-DC-12-202260, HONORABLE CLIFFORD BROWN, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Jose Godinez Matute was charged with aggravated sexual assault of a child by penetrating the child's sexual organ. *See* Tex. Penal Code § 22.021(a)(1)(B), (a)(2)(B). At the time of the alleged offense, Matute was in his twenties, and the victim, B.A., was eleven years old. After a trial, the jury found Matute guilty and assessed his punishment at 30 years' imprisonment. *See id.* §§ 22.021(e) (providing that offense is first-degree felony), 12.32 (setting out punishment range for first-degree felony). In two issues on appeal, Matute challenges the legal sufficiency of the evidence supporting his conviction and asserts that the district court erred by allowing a witness to testify "regarding an interrogation without requiring the State to present the best evidence of that interrogation." We will affirm the district court's judgment of conviction.

### Legal Sufficiency of the Evidence

In his first issue on appeal, Matute challenges the legal sufficiency of the evidence supporting his conviction. As set out above, Matute was charged with aggravated sexual assault of

a child. Under the Penal Code, an individual commits that offense if he "intentionally or knowingly . . . causes the penetration of the anus or sexual organ of a child by any means" and "if the victim is younger than 14 years of age." Tex. Penal Code § 22.021(a)(1)(B)(i), (a)(2)(B).

Under a legal-sufficiency review, appellate courts view the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When performing this review, an appellate court must bear in mind that it is the factfinder's duty to weigh the evidence, to resolve conflicts in the testimony, and to make reasonable inferences "from basic facts to ultimate facts." *Id.* Moreover, appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Furthermore, appellate courts presume that conflicting inferences were resolved in favor of the conviction and defer to that resolution. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

During the trial, B.A., B.A.'s mother, various law-enforcement personnel, and Matute all testified regarding the alleged offense. In her testimony, the victim's mother, J.R., testified that at the time of the alleged offense, her daughter was eleven years old, was in special-education classes, and had been diagnosed with various learning disabilities. Regarding the offense, she explained that she called the police after someone from her neighborhood told her that B.A. had gotten into "a black car" with a man. In addition, J.R. related that when she scanned the call history for her cell phone, she noticed that B.A. had used the phone to call someone, and she stated that she

repeatedly called the number to find out if the person knew where B.A. was and gave the number to the police. Moreover, she testified that during one of the calls, a man answered but that he denied knowing B.A. Further, J.R. explained that eventually B.A. returned home looking scared and that the police immediately questioned her about where she had been.

After J.R. finished her testimony, B.A. was called to the stand. In her testimony, B.A. often answered questions by stating that she did not know or had forgotten the answer, but she recalled that she called Matute on the phone,[1] asked him to pick her up, and got into his black car. Further, she explained that there was a child's car seat in the back of the car. In addition, she testified that after she got in the car, Matute drove to various hotels but that he was unable to check into one because he did not have any identification. Moreover, she mentioned that Matute was trying to get a hotel room in order to have sex with her and generally described in terms consistent with her age that sex involves "private parts" touching and touching on the "inside" of her "private part." Next, she stated that she had sex with Matute outside of the car behind some apartments, and she described the positions of their bodies, stated that it felt "weird" when his "private part" touched hers, and recalled that he used a condom during the incident. After describing the alleged offense, B.A. stated that Matute dropped her off at a corner, that she walked the rest of the way home, that there were police officers present when she returned home, and that she directed one of the officers to where she had had sex with Matute. Later, B.A. testified that she told the officer that Matute was

---

[1] In her testimony, B.A. referred to the person that assaulted her as Antonio. However, she also pointed out Matute and identified him as the person that she knew as Antonio. For that reason, we will refer to Matute when summarizing her testimony.

3

not the first person that she had sex with and that she had previously had sex with Matute's cousin Javier four days before the incident at issue.[2]

Next, one of the responding officers, Officer Jennifer Szimanski, testified that J.R. informed her that a man had been calling on the phone for B.A. for over a week. In addition, Officer Szimanski explained that she questioned B.A. about the incident, and Officer Szimanski recalled that B.A. was scared and told her that "he came to do sex with me," that Matute picked her up in a black four-door car, that Matute drove to several hotels but was unable to get a room because he had no identification, that he took her to a parking lot behind one of the hotels to have sex, and that Matute wore a condom. Next, Officer Szimanski testified that she asked B.A. if she could guide her to where the incident occurred, that B.A. directed her to a parking lot, and that there was a condom wrapper in the parking lot.

After Officer Szimanski concluded her testimony, the sexual-assault nurse examiner that examined B.A., Kathleen Gann, testified regarding the events that occurred after Officer Szimanski drove B.A. to the hospital. In her testimony, Gann recalled what B.A. told her of the events, including that "the suspect wanted to have sex," that they had sex, that "he touched her butt," and that he touched her in her "private part . . . with his thing. It felt awkward because no one ever touched [her] like that." In addition, although Gann explained that it was initially difficult to get B.A. to talk about what had happened, she also revealed that B.A. identified a penis on a male diagram and stated that

_____

[2] On cross-examination, B.A. admitted that she did not mention having sex with Javier when she talked to the prosecutors, but she later explained that she did not remember that when the prosecutors initially questioned her. In addition, Matute questioned B.A. regarding whether she mentioned Javier when she was examined by the sexual-assault nurse examiner.

the suspect touched her "where she peed from and where she pooped from" with his penis and that the suspect gave her a hickey on her neck. Regarding the exam that she performed, Gann testified that B.A. had a hickey on her neck, that B.A. had various tears on her genitals, and that B.A. had a tear on the perineum, which is the area between the vagina and the anus, that was "oozing blood." Moreover, Gann explained that the injuries that she observed were consistent with B.A.'s recollection of the events and that the tear to the perineum was recent and consistent with "blunt trauma to her genital area earlier that afternoon." When questioned about the possibility that the injuries could have resulted from a previous sexual encounter occurring four days earlier, Gann related that given that the areas involved heal quickly, particularly at B.A.'s age, it was unlikely those injuries would still be present.

In addition to this testimony, various law-enforcement personnel were called to testify regarding the investigation and regarding testing that was done on the evidence collected. First, Detective Brent Kelly testified that after obtaining phone records for J.R.'s cell phone, he learned that the phone number that J.R. called after B.A. went missing was registered to a phone belonging to Matute. Moreover, Detective Kelly explained that the phone records showed that several calls were made between Matute's phone and J.R.'s phone in the days leading up to the incident. In addition, Detective Trent Watts related that Matute had that phone on him when he was questioned by the police. Further, Detective Peter Bonilla stated that when he was questioning him, Matute admitted that he owned a black Toyota Corolla, that he knew B.A., and that she got into his car.

Regarding testing performed on the evidence, Tyler Belknap stated that he tested the condom wrapper for latent fingerprints. Before discussing the results of the testing, Belknap

recalled that when he obtained fingerprints from Matute, "there was some sort of injury to all of [his] fingers" and that injuries "impair the analysis and comparison process." In light of this explanation, he testified that in the first analysis that he performed, "the known fingerprints were incomplete to the latent print" obtained from the condom wrapper, meaning that "the area needed for comparison had some sort of injury to it which didn't allow [him] to either exclude or identify the person in question." Similarly, during his cross-examination, Belknap testified that another individual in his department obtained a similarly inconclusive result. However, Belknap also explained that when he later used other known fingerprints for Matute, he "could immediately see that the quality of the fingerprints were much better and would probably yield a better comparison." In fact, Belknap explained that in his second round of testing, he was able to identify Matute's right thumb print on the condom wrapper.

In addition to testimony regarding fingerprints, various officials testified regarding testing done on biological samples taken from B.A. and Matute after the alleged offense. First, Sapana Prajapati testified that swabs taken of B.A.'s external genitals and anal region as well as her shorts and underwear had blood in them. Further, she explained that she tested a swab taken from B.A.'s neck and determined that Matute could not "be excluded as a contributor to" that sample. In fact, she stated that "[t]he probability of selecting an unrelated person at random that could be a contributor to this profile is approximately . . . 1 in 27.49 million for Hispanics." Next, Lindsey Ayers testified that she tested pieces of hair collected from B.A.'s underwear. Specifically, she stated that the hair appeared to be pubic hair and related that although the test was "a limited comparison," it was her opinion that the hair recovered from the underwear could have come from

6

Matute because the hair was "microscopically similar" to pubic hair later retrieved from Matute. Then, Emma Becker explained that she performed DNA testing on the pubic hair recovered from B.A.'s underwear and revealed that the first test that she performed did not identify Matute as a contributor but that more sensitive testing that she performed later and that directly looks for Y chromosomes revealed that the recovered hair "is consistent with the . . . profile of" Matute and that Matute could not be excluded as the contributor of the DNA.

Finally, after the State rested, Matute elected to testify. In his testimony, Matute acknowledged that he knew B.A. and that he met her on the day of the alleged assault at a "washateria" because her boyfriend had asked him to give her a ride to a party. Moreover, he explained that B.A. kept trying to get close to him and admitted that he kissed B.A. on her cheek at her request, but he insisted that nothing else happened. Further, Matute called B.A. a liar and said that "[s]he likes to go with different men." On cross-examination, he admitted that at the time of the offense, he drove a black car that had car seats in the back for his young children.

In light of all of the evidence summarized above, including the testimony of B.A. and Matute, as well as the reasonable inferences that the factfinder could have made from that evidence and given that the standard of review for legal-sufficiency challenges obligates appellate courts to defer to the factfinder's resolution of conflicts in the testimony and to review the evidence in the light most favorable to the verdict, *see Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 16-17; we conclude that the evidence was legally sufficient to support the district court's judgment of conviction. Accordingly, we overrule Matute's first issue on appeal.

7

**Best Evidence**

In his second issue on appeal, Matute contends that the district "court erred in allowing testimony regarding an interrogation without requiring the State to present the best evidence for that interrogation." *See* Tex. R. Evid. 1002. Specifically, Matute refers to portions of the testimony from Detective Bonilla in which he described his questioning of Matute and insists that the video of the interrogation should have been admitted instead. Moreover, Matute insists that the district court's ruling was improper because if the video of the interrogation had been admitted, "the jury could have seen [Matute] repeatedly denying that he committed any crime, despite Bonilla's tactics as an investigator." Matute argues that he was harmed by the district court's ruling for the same reason.

We review a trial court's ruling on the admission of evidence under an abuse-of-discretion standard of review. *See Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside the zone of reasonable disagreement, *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is arbitrary or unreasonable, *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Moreover, the trial court's ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005).

When Matute argued during the trial that the best evidence of what Detective Bonilla said and observed was the video of the interrogation, the district court explained that it was unnecessary to admit the video because Detective Bonilla was "here testifying." The court of criminal appeals has confronted a similar issue before. *See Burdine v. State*, 719 S.W.2d 309 (Tex. Crim.

8

App. 1986), *superseded in part on other grounds by rule change as stated in Barnes v. State*, 876 S.W.2d 316, 325-26 (Tex. Crim. App. 1994) (explaining that Rules of Evidence 401, 402, and 403 were modified since holding in *Burdine*). In *Burdine*, Burdine argued that "his oral statement made to police officers should not have been admitted in evidence, because the statement was offered in the form of the officers' testimony rather than the tape recording made at the time the statement was given." *Id.* at 318. Although the court decided that the best-evidence rule in effect at the time did not apply to electronic recordings, it also commented that even if it did, Burdine's claim would not be sustained because the issue was "the contents of the *conversation* on the recording, and not the recording itself. Since [the police officer] participated in the conversation, his testimony describing the interrogation was sufficient for best evidence purposes." *Id.* at 318 n.5.

More recently, our sister court of appeals issued an opinion agreeing with the reasoning in *Burdine*. *See Cox v. State*, No. 05-11-00687-CR, 2012 Tex. App. LEXIS 5380 (Tex. App.—Dallas July 9, 2012, pet. dism'd) (not designated for publication). In *Cox,* Cox argued that the trial court erred by allowing a witness to testify regarding events that he "observed on the closed-circuit television monitor when . . . the best evidence was a video recording of the events that had been generated by the closed-circuit television monitoring system." *Id.* at *3-4. However, the court determined that the witness:

> testified concerning what he observed on the closed-circuit television monitor as it occurred. . . . That events observed by [the witness] on the closed-circuit television monitor could have been copied to a compact disc and preserved does not alter the fact that [the witness] testified concerning what he observed in real time. [The witness]'s testimony regarding his observations of the events as they occurred as depicted on the closed-circuit television monitor is not testimony regarding, or dependent upon, a videotape recording.

9

*Id.* at *9-10.

In addition, federal courts interpreting the federal version of the best-evidence rule have reached similar results. *See* Fed. R. Evid. 1002 (requiring original recording "in order to prove its content unless these rules or a federal statute provides otherwise"); *see, e.g.*, *United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004) (concluding that witness's testimony when he did not observe alleged actions violated best-evidence rule and noting that rule applies when witness seeks to testify about contents of recording, particularly where witness was not privy to events on recording); *United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996) (explaining that "a tape recording cannot be said to be the best evidence of a conversation when a party seeks to call a participant in or observer of the conversation to testify to it. In that instance, the best evidence rule has no application at all"); *United States v. Fagan*, 821 F.2d 1002, 1009 n.1 (5th Cir. 1987) (characterizing as "completely without merit" best-evidence argument that sheriff should not testify regarding his recollection of interview because interview was taped and stating that rule was inapplicable where prosecution was trying to prove contents of conversation rather than contents of recording); *United States v. Gonzales-Benitez*, 537 F.2d 1051, 1053-54 (9th Cir. 1976) (noting that argument that tape recording of conversation should have been introduced instead of allowing participant to testify was puzzling and misconstrued purpose of best-evidence rule and explaining that although tape recording would have been admissible as evidence of conversation, "testimony by participants was equally admissible and was sufficient to establish what was said").

In light of this authority, we cannot conclude that the district court abused its discretion by overruling Matute's best-evidence objection during trial or by allowing Detective Bonilla

to testify without requiring the State to introduce the video of the interrogation. Accordingly, we overrule Matute's second issue on appeal.

## CONCLUSION

Having overruled Matute's two issues on appeal, we affirm the district court's judgment of conviction.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   November 26, 2014

Do Not Publish