176 P.3d 885

STATE of Hawai'i, Respondent/Plaintiff–
Appellee

v.

Christopher K. ESPIRITU,
Petitioner/Defendant–
Appellant.

No. 27354.

Supreme Court of Hawai'i.

Jan. 28, 2008.

MOON, C.J., LEVINSON, ACOBA, and DUFFY, JJ.; and NAKAYAMA, J., Dissenting.

Opinion of the court by ACOBA, J.

Petitioner/Defendant–Appellant Christopher K. Espiritu (Petitioner) filed an application for writ of certiorari on October 3, 2007, seeking review of the judgment of the Intermediate Court of Appeals (the ICA) filed on July 5, 2007, pursuant to its May 31, 2007 Summary Disposition Order (SDO) [1] affirming the May 18, 2005 judgment of the Circuit Court of the Second Circuit [2] (the court) convicting Petitioner of attempted murder in the second degree (Count 1), carrying or use of a firearm in the commission of a separate felony (Count 2) (Cr. No. 03–1–0635), and place to keep firearm (Count 3) (Cr. No. 02–1–0666), and sentencing him to concurrent terms of life imprisonment with the possibility of parole on Count 1, twenty years on Count 2, and ten years on Count 3.[3] Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) did not file a memorandum in opposition. For the reasons stated herein, we affirm the ICA judgment in part, vacate the judgment in part, vacate the court's judgment in part, and remand for a new trial as to Counts 1 and 2. *See supra* note 3.

## I.

The essential facts as set forth in the Application stated:

> At trial, the complaining witness, ... [the Complainant], testified extensively regarding the events of December 4, 2002 and her relationship with Petitioner leading up to that day. [The Complainant] testified that she first met [Petitioner] around June or July of 2001 at the Fish and Game Bar on Maui. [The Complainant]

Cynthia A. Kagiwada for petitioner/defendant-appellant.

Peter A. Hanano, Deputy Prosecuting Attorney, County of Maui, for respondent/plaintiff-appellee.

1. The summary disposition order was issued by Chief Judge Mark Recktenwald, and Associate Judges Corinne K.A. Watanabe and Daniel R. Foley.

2. The Honorable Joel E. August presided.

3. Petitioner does not expressly state what counts he challenges. Instead, Petitioner refers to the entire SDO issued by the ICA that affirmed all of his convictions. However, Petitioner's arguments only address Count 1. Because Petitioner presents no discernible argument on Count 3, we reaffirm Petitioner's conviction on Count 3 and remand the case for a new trial as to Count 1, the charge of attempted murder in the second degree, and Count 2, the charge of use of a firearm in the commission of a separate felony, inasmuch as that count apparently refers to the separate felony charged in Count 1. *See State v. Bui,* 104 Hawai'i 462, 464 n. 2, 92 P.3d 471, 473 n. 2 (2004) (stating that the appellate courts have discretion to disregard claims for which no discernable argument was presented).

estimated that she was in a "dating relationship" or sexual relationship with [Petitioner] for about two months. After the "dating relationship" ended, [the Complainant] continued to have contact with [Petitioner.]

On December 4, 2002, the Complainant finished work and met Derek Liburd (Liburd) at the Fish and Game Bar. Thereafter the Complainant and Liburd went to the Complainant's home and had sex.

According to the Application,

[w]hile they were in the bedroom, the motion detector light by [the Complainant's] window went off, so they looked outside but they didn't see anything. [The Complainant] and [Liburd] continued to have sex.

Not very long after the motion light went off, [the Complainant] saw [Petitioner] at the bottom of her stairs outside her bedroom with a gun. [Liburd] struggled with [Petitioner] and then [the Complainant] saw [Liburd] run up the stairs.... [The Complainant] stated that [Petitioner] had the gun next to the left cheek of her face.... [The Complainant] testified that [Petitioner] told her "you are going to die tonight" and "we're both going to die." ... Then [Petitioner] shot [the Complainant].

. . . .

Following the shooting, Detective Chad Viela interviewed [the Complainant] ... [who] showed Detective Viela four text messages from her cell phone that she had allegedly received from [Petitioner] between November 29, 2002 and December 4, 2002....

Additionally, Anthony Manoukian [Dr. Manoukian], a forensic pathologist, testified regarding the projected distance of the gun from [the Complainant] and the position of the shooter based on the trajectory of the bullet. Over defense objection, Dr. Manoukian performed a live demonstration as to the position of the gun at the

time of the shooting and whether he (Dr. Manoukian) could reach the gun.

Petitioner did not testify.

## II.

In his Application, Petitioner lists the following questions:

I. Whether the [ICA] gravely erred by failing to analyze whether [the Complainant's] testimony violated the hearsay and the best evidence rules?

II. Whether the [ICA] gravely erred by failing to apply Hawai'i Rule[s] of Evidence [ (HRE) Rule] 403 and whether the [SDO] is inconsistent with *Yap v. Controlled Parasailing of Honolulu, Inc.,* 76 [Hawai'i] 248, 873 P.2d 1321 (1994) and *Lau v. Allied Wholesale, Inc.,* 82 [Hawai'i] 428, 922 P.2d 1041 ( [App.] 1996)?

III. Whether the [ICA] gravely erred by determining that the prosecutor's improper closing and rebuttal statements were not prosecutorial misconduct where the prosecutor misstated the law on at least two occasions?

We hold that (1) the ICA did not err in ruling that the court acted in accordance with the HRE, including the hearsay and best evidence rules, in allowing the Complainant to review a police report describing the four text messages allegedly sent to her by Petitioner and to testify about those messages, (2) the results of the demonstration of Dr. Manoukian and its effect on Petitioner's case are unclear, and (3) the ICA gravely erred in determining that in closing argument the prosecutor did not misstate the law regarding the extreme mental or emotion disturbance (EMED) defense and that there is a reasonable possibility that these misstatements contributed to Petitioner's conviction.[4]

## III.

## A.

The following facts are relevant to the first question.

---

**4.** Inasmuch as we remand the case, we address all the questions raised by Petitioner as set forth in our holding.

After the shooting, Detective Viela interviewed the Complainant. During the interview, the Complainant showed Detective Viela four text messages that she saved on her cell phone and alleged that Petitioner sent these messages to her between November 29, 2002, and December 4, 2002. Petitioner's defense counsel objected to the Complainant testifying about the contents of the text messages.

Defense counsel contended that the Complainant's testimony regarding the text messages would be "double hearsay" because the messages were copied onto note paper that was destroyed and the messages were copied by Detective Viela rather than by the Complainant herself. Respondent argued that the contents of the text message[s] were "not hearsay because [they are] statement[s] from the [Petitioner]" and therefore fit within the hearsay exception that allows the introduction into evidence of "[a]ny statement by the party opponent."

Respondent also argued that the Complainant was allowed to testify on the messages after reviewing the police report because "[w]hat was copied on the [report] is going to be used to refresh her recollection." Defense counsel countered Respondent's points by maintaining that the hearsay exception was inapplicable because "the messages may have come from [Petitioner's] cell phone, but that doesn't prove who they are from," and, thus, the text messages were "still hearsay." Counsel also declared that the Complainant's memory would not be refreshed as to the contents of the messages when she received them because "what she's going to have a memory of is reading the report, which is still hearsay."

The court stated that the Complainant's testimony was not the best evidence with regard to the text messages as "the best evidence probably would have been photographs" of the actual messages on the cell phone. Nonetheless, the court permitted the Complainant to testify on the content of the text messages, reasoning that the issues raised by defense counsel would "go to the weight" of the testimony.

## B.

### 1.

The Complainant testified that the first text message was received on November 29, 2002. She stated, "The gist was something like[,] 'The true face shows, I guess, all the brothers and sisters were right.'" Respondent showed a copy of the police report including the date, time, and message to refresh the Complainant's recollection after she could not remember the time at which she received the message. Respondent did not ask if the Complainant's memory was refreshed before proceeding to question the Complainant on the first text message. After looking at the report, Complainant testified that the precise words of the first message were, "The true face shows all the guys and girls were right."

### 2.

The Complainant testified that she received the second text message on November 29 or November 30, and although she could not remember the subject matter, she remembered that she perceived it as having "a threatening nature" and had "to do with the word going to the locals, or something like that."

Respondent asked the Complainant if seeing the report which contained the date, time, and contents of the second message would refresh her memory, to which the Complainant agreed that it would. After viewing the report, Respondent asked the Complainant if her memory was refreshed and the Complainant agreed that it was refreshed. The Complainant testified that she received the second text message on November 30, and the words of the message were, "I'm tired of being the sucker. What goes around comes around."

### 3.

The Complainant testified that the third message informed her that the "word" was "going to go out to the locals."

Respondent asked the Complainant if seeing the report which contained the date, time, and contents of the second message would refresh her memory, to which the

Complainant agreed that it would. After viewing the report, Respondent asked the Complainant if her memory was refreshed and the Complainant agreed that it was refreshed. The Complainant testified that the third text message stated, "You should have talked to me, but you're too pig-headed for our kind. There's a new message going out to the locals."

### 4.

The Complainant testified that she received the fourth text on December 4, 2002, shortly before the shooting, and that it said, "I have to say I'm so, so sorry." The Complainant did not review the police report to refresh her memory regarding the fourth text message.

### IV.

As to the first question, Petitioner maintains that the following precepts control: (1) "[w]here the facts necessary to admissibility are disputed, the offering party has the burden of proof by a preponderance of the evidence[ ]" (quoting *State v. West*, 95 Hawai'i 452, 460, 24 P.3d 648, 656 (2001) (brackets omitted)); (2) "[t]he court must consider whether a witness can testify from personal knowledge and specifically whether the witness perceived the event about which the witness testifies and has a present recollection of that perception[ ]" (citing *State v. Dibenedetto*, 80 Hawai'i 138, 144–45, 906 P.2d 624, 630–31 (App.1995); Commentary to HRE Rule 602); (3) "[a] witness may use a writing to refresh his or her memory for the purpose of testifying[ ]" (quoting HRE Rule 612 (1993); *Dibenedetto*, 80 Hawai'i at 144, 906 P.2d at 630) (brackets omitted), "[h]owever, the witness must testify from her refreshed recollection, not from a memory of the writing itself[ ]" (citing *State v. Ferrer*, 95 Hawai'i 409, 432–33, 23 P.3d 744, 767–68 (App.2001)).

### A.

Based on these premises, Petitioner asserts that (1) the Complainant's testimony about the text messages was double hearsay because the "text messages read by [the Complainant] contained multiple hearsay statements and were neither originals nor duplicates[,]" and (2) the Complainant's testimony about the text messages was not admissible under HRE Rule 612 because "[Respondent] failed to meet its burden of proving that [the Complainant's] memory was refreshed by the police report." According to Petitioner, "[Respondent] failed to show that [the Complainant] was testifying from her revived memory rather than a memory of the writing itself." (Citing *Ferrer*, 95 Hawai'i at 432–33, 23 P.3d at 767–68.)

### B.

### 1.

As to the first argument regarding hearsay, Petitioner contends in his opening brief that the text messages are hearsay. Hearsay is defined by HRE Rule 801 (2002) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Hearsay is not admissible at trial unless it qualifies as an exception to the rule against hearsay." *State v. Zukevich*, 84 Hawai'i 203, 205, 932 P.2d 340, 342 (App.1997) (internal citations omitted). "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule" provided under the HRE. HRE Rule 805 (1993). Although Petitioner and Respondent cite no cases, they are correct as to their position that a text message is hearsay if offered to prove the truth of the matter asserted. *See State v. Franklin*, 280 Kan. 337, 121 P.3d 447, 451–52 (2005) (holding that a text message constituted hearsay insofar as it was offered to prove the truth of the statement asserted).

However, Petitioner concedes that the actual text messages would arguably be admissible as an exception to the hearsay rule as an admission by a party-opponent under HRE 803(a)(1). Thus, Petitioner and Respondent appear to agree that the text messages themselves are hearsay but are admissible as a party admission. That exception provides that an admission by a par-

ty-opponent is "[a] statement that is offered against a party and is (A) the party's own statement, in either the party's individual or representative capacity...." HRE Rule 803(a)(1).

The text messages qualify as statements offered by Respondent against Petitioner to show Petitioner's history of threats against the Complainant and, hence, were admissions by a party-opponent under HRE Rule 803(a)(1).[5] Petitioner and Respondent thus also appear correct that the actual text messages would be admissible as an exception to hearsay under HRE Rule 803(a)(1).

### 2.

Next, inquiry must be made as to whether testimony about the text messages constitutes hearsay and whether such testimony is admissible under an exception to the rule against hearsay. Petitioner does not make any argument as to whether testimony about the messages are hearsay or whether this testimony would be admissible under an exception. Rather, Petitioner focuses his discussion on the allegation that the Complainant's testimony was inadmissible hearsay because the Complainant read aloud from an inadmissible police report about the messages. Respondent also does not address whether the testimony about the text messages is hearsay.

■ Momentarily setting aside the issue of whether the Complainant testified from her memory or from a verbatim reading of the police report, in general, testimony about the text messages is hearsay. If evidence is hearsay, then testimony about the evidence is also hearsay. *See Bueno v. State,* 677 S.W.2d 261, 265 (Tex.Ct.App.1984) (holding that police officer's testimony about writing on a card given to him by the motel manager was hearsay where it was offered to prove the motel room was registered to the defendant). Correspondingly, if evidence is hearsay admissible under an exception to the rule

against hearsay, then testimony about such evidence is admissible. *See People v. Taylor* 117 A.D.2d 829, 499 N.Y.S.2d 151 (1986) (holding that victim's writing in his own blood of attacker's name was hearsay admissible under the exceptions for dying declarations and excited utterances and therefore, testimony from witnesses regarding the writing was admissible). Thus, the Complainant's testimony about the text messages is admissible because the text messages themselves would be admissible under the exception for party admissions.

### C.

### 1.

Petitioner also argues that the court committed error in allowing the Complainant to testify "because her testimony neither constituted the original nor a duplicate of the text message" as required by HRE Rule 1002 (1993). Petitioner contends that the original text messages for purposes of HRE Rule 1002 "would have consisted of the cell phone itself with the saved messages or a printout of the messages." Respondent counters that (1) HRE 1002 is inapplicable in this case because a text message does not qualify as a writing, recording, or photograph; (2) there was no evidence that it was possible to obtain a printout of the messages; (3) that no photographs were taken of the messages does not preclude the admission of the Complainant's testimony about the messages; (4) even if HRE Rule 1002 is applicable here, HRE Rule 1004 (1993) allows the admission of other evidence in place of the original where the original is lost or destroyed; and (5) Petitioner failed to raise an objection to the Complainant's testimony based on HRE Rule 1002 and, thus, waived the right to raise an argument based on HRE Rule 1002.

HRE Rule 1002 provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise

---

**5.** The HRE Rule 803(a)(1) exception for party admissions does not require that the statement be against interest when made. Commentary to HRE Rule 803. *See also Kekua v. Kaiser Found. Hosp.,* 61 Haw. 208, 216 n. 3, 601 P.2d 364, 370 n. 3 (1979) (explaining that party admissions, in contrast to statements against interest, "need not have been against the declarant's interest when made, need not be based on the declarant's personal knowledge, [and] may be in the form of an opinion").

provided in these rules or by statute."[6] A writing or recording is defined in HRE 1001 (1993) as "consist[ing] of letters, words, sounds, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation." This definition is identical to FRE Rule 1001.

■ Contrary to Respondent's assertion, a text message is a writing because it consists of letters, words, or numbers set down by mechanical or electronic recording, or other form of data compilation. Although neither party makes this assertion, text messages received on cell phones appear akin to messages received on computers and email for purposes of HRE Rule 1002. *See Laughner v. State,* 769 N.E.2d 1147, 1159 (Ind.Ct.App. 2002) (holding that text messages sent between computers through an internet chat room were subject to the original writing rule and a printout of the messages was an original for purposes of the rule), *cert. denied,* 538 U.S. 1013, 123 S.Ct. 1929, 155 L.Ed.2d 849 (2003), *abrogated on other grounds by Fajardo v. State,* 859 N.E.2d 1201 (Ind.2007). Thus, HRE Rule 1002 which requires an original in order to prove the content of a writing is applicable unless an exception under the HRE or a statute provides otherwise.

### 2.

■ Although HRE Rule 1002 would ordinarily preclude the admission of testimony about the text messages because such testimony is not an original, the testimony here is admissible because HRE Rule 1004 applies to the text messages such that other evidence may be admitted to prove the content of the text messages. HRE Rule 1004 provides an exception to the original writings requirement of HRE Rule 1002 inasmuch as HRE Rule 1004 provides that:

> The original or a duplicate is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if:

(1) *Originals lost or destroyed.* All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith[.]

(Emphasis added.)

This Rule is identical to FRE Rule 1004 except that HRE Rule 1004 eliminates the need for a duplicate as well if the aforementioned condition is met.

The Complainant no longer had the actual text messages because the Complainant no longer had the cell phone or the cell phone service from Verizon through which she received the messages. No other original version of the text messages appear to have existed because there is no indication from the record that the text messages were ever printed out, nor is it clear that it was possible for the messages to be printed from the phone. Thus, for purposes of HRE Rule 1004, the original text messages were "lost or destroyed."

■ Petitioner argues that "the original writing was lost or destroyed due to the bad faith of the State of Hawai'i." However, there is no evidence that Respondent exercised bad faith that led to the loss of the cell phone, which Petitioner contends was the "original" for purposes of HRE Rule 1002. Bad faith cannot reasonably be inferred because the Complainant failed to preserve text messages for over two years on a cell phone for which she discontinued service. Similarly, bad faith cannot be inferred because the text messages were not printed out when there is no indication that such a printout was even possible.

Indeed, courts agree that HRE Rule 1004(1) is "particularly suited" to electronic evidence "[g]iven the myriad ways that electronic records may be deleted, lost as a result of system malfunctions, purged as a result of routine electronic records management software (such as the automatic deletion of e-mail after a set time period) or otherwise unavailable...." *Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534, 580

---

**6.** HRE Rule 1002 is identical to Federal Rules of Evidence (FRE) Rule 1002 except that the word "statute" in HRE Rule 1002 is substituted for the phrase "Act of Congress" found in FRE Rule 1002.

(D.Md.2007). *See also King v. Kirkland's Stores, Inc.*, No. 2:04–cv–1055–MEF, 2006 WL 2239203, at *5 (D.Ala. Aug. 4, 2006) (unpublished decision) (holding that plaintiff's testimony regarding the content of an e-mail from defendant was admissible although plaintiff argued only that a copy of the e-mail, as opposed to the original or sole copy, was in the possession of the defendant); *Bidbay.com, Inc. v. Spry*, No. B160126, 2003 WL 723297, at *7 (Cal.App. Mar. 4, 2003) (unpublished opinion) (stating that the exception to the original writing rule permitting the substitution of secondary evidence would apply in light of the "tenuous and ethereal nature of writings posted in Internet chat rooms and message boards").

Petitioner argues that Respondent "should not be excused from producing the original or a duplicate of the text messages, which are otherwise inadmissible under the best evidence rule," because Respondent "has not shown that it would have been impossible or even difficult to download, photograph, or print out the data from [the Complainant's] cell phone." In support of this argument, Petitioner cites *United States v. Bennett*, 363 F.3d 947, 953–54 (9th Cir.2004), wherein the Court of Appeals for the Ninth Circuit held that in accordance with the best evidence rule, the court could not admit secondary evidence pertaining to a global positioning system (GPS) reading as the government failed to show that it would have been difficult or impossible to download or print out the GPS data. That case is distinguishable in that there was no evidence that the GPS data had been lost or destroyed. *Id.* at 954. Rather, the witness testifying about the data stated that he was not the GPS custodian and it was not necessary to videotape or photograph the GPS contents. *Id.*

In contrast, here, it appears that the cell phone containing the text messages is unavailable. The Complainant testified that she changed cell phone service providers since the time of the accident. Furthermore, Petitioner concedes that "the original cell phone is no longer available and there is no indication that any photographs exist of the text messages" therefore, "neither the original nor any duplicates exist."

In addition, this court is not bound by the holding in *Bennett.* The plain language of HRE Rule 1004 states that an original or duplicate is not required to prove the contents of a writing or recording so long as the originals are lost or destroyed and such loss or destruction was not due to the bad faith of the proponent of the evidence. There is no requirement that the proponent must show that it was impossible or difficult to download or print out the writing at the time that it existed.

### 3.

Respondent contends that Petitioner may not argue against the admission of the Complainant's testimony under HRE Rule 1002 as Petitioner did not raise an objection under HRE Rule 1002 at trial. Petitioner counters that the court itself acknowledged that the Complainant's testimony was not the best evidence and that it had a "running objection" to the entire line of questioning about the text messages.

Respondent correctly states the law that "failure to properly object to the introduction of evidence in violation of the original writing rule likely will result in a waiver of the error on appeal." *Lorraine*, 241 F.R.D. at 579 (citing Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 1002.04[5][a] (Joseph M. McLaughlin ed., Matthew Bender 2d ed.1997)). However, because the Complainant's testimony regarding the text messages was admissible under HRE Rule 1004 as described above, it is not necessary to resolve the question of whether Petitioner did raise an objection under HRE Rule 1002.

### D.

### 1.

The crux of Petitioner's argument against the admission of the Complainant's testimony is that the Complainant's testimony was inadmissible because it consisted of the Complainant reading excerpts from a police report typed by a clerk where the reports were based on notes copied by the police officer who interviewed the Complainant and who examined the actual text messages. Respon-

dent does not make any argument that the police report, typed by a clerk from notes made by the officer who observed the actual messages, was not hearsay or that this report was hearsay admissible under an exception to the rule against hearsay.

█ Preliminarily, Petitioner is correct that the police report was hearsay. The police report did not qualify under the exception for past recollection recorded under HRE 802.1(4) (1993). That Rule provides:

The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:

. . . .

(4) Past recollection recorded. A memorandum or record concerning a matter about which the witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, *shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly.* If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

(Emphasis added.) The police report is not a past recollection recorded because the report was not "shown to have been made or adopted by the [Complainant] when the matter was fresh in the [Complainant's] memory."

█ Petitioner is also correct that the police report is not an exception to hearsay as a public record or report under HRE Rule 803(b)(8) (1993). That Rule states that the following is admissible as an exception to the rule against hearsay:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(b) Other exceptions.

. . . .

(8) Public records and reports. Records, reports, statements or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel,* or (C) in civil proceedings and against the government in criminal cases, factual findings from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

(Emphasis added.) Because HRE Rule 803(b)(8) expressly excludes "matters observed by police officers" from admission under the exception for public records and reports, the police report in this case is not admissible under this exception.

The police report describing the text messages is hearsay and is inadmissible under the exceptions to the hearsay rule for past recollections recorded under HRE 802.1(4) and public records and reports under HRE 803(b)(8). Respondent has not argued that the police report is not hearsay or is hearsay admissible under an exception to the rule against hearsay. Thus, the police report itself was inadmissible hearsay and recitation of the report by the Complainant would therefore be inadmissible hearsay.

2.

a.

Although recitation of the police report by the Complainant would be improper, Petitioner and Respondent both agree that the Complainant could testify about the text messages after viewing the police report if the report was used to refresh her recollection about the text messages she allegedly received from Petitioner. However, as noted before, Petitioner argues that the Complainant "[did] not [use] the police report to refresh her memory but instead [read] the contents of the police report verbatim." In contrast, Respondent maintains that "there is

sufficient evidence that [the Complainant] testified from her *present* recollection regarding all four of the text messages[.]" (Emphasis in original.)

■ HRE Rule 612 provides that a witness may use a writing to refresh his memory for the purpose of testifying. Petitioner and Respondent both cite *Dibenedetto*, for the rule that when a writing is used to refresh a witness's memory, the witness's testimony should be based on "a memory thus revived, resulting in testimony from present recollection, not a memory of the writing itself." 80 Hawai'i at 144, 906 P.2d at 630 (internal quotation marks and citation omitted). If the writing does not refresh the witness's memory, the witness may not testify regarding the contents of the writing unless the writing is itself admitted into evidence. *Id.* (internal citation omitted). "Thus, where a witness never perceived the matters described or where the writing does not reawaken recollection of past perception, Rule 612 does not permit a witness to simply read into evidence the contents of the writing." *Ferrer*, 95 Hawai'i at 432, 23 P.3d at 767 (internal citation omitted).

b.

■ Petitioner's argument that the Complainant was not using the report to refresh her memory but was instead using the report to recite verbatim the text messages is unpersuasive. As described above in Sections III.B.1. through 4., Petitioner accurately recalled the gist or the general nature of each text message prior to viewing the police report.

With respect to the first text message, the Complainant stated that "[t]he gist was something like[,] '[t]he true face shows, I guess, all the brothers and sisters were right.'" After viewing the report, the Complainant stated that the precise words were, "[t]he true face shows all the guys and girls were right." The Complainant's testimony regarding the first message was nearly identical both before and after viewing the report.

With respect to the second message, the Complainant stated that although she could not remember the wording of the message,

she remembered she "took it in a threatening nature." After viewing the report, the Complainant stated that the second message stated, "I'm tired of being the sucker. What goes around comes around." The Complainant was correct in that the second message could be construed as a threat.

Regarding the third message, the Complainant stated that it "was the one where it was the word was going to go out to the locals." The third message, the Complainant testified after viewing the report stated, "You should have talked to me, but you're too pig-headed for our kind. There's a new message going out to the locals." Although the Complainant omitted the insult in the first sentence, the Complainant's description of the second sentence was nearly identical before and after viewing the report.

With respect to the fourth message, the Complainant stated that this message said, "I have to say I'm so, so sorry." Respondent correctly points out that "there is no indication in this instance, that [the Complainant] even needed to have her recollection refreshed with the police report."

In light of the fact that the Complainant described the key elements of the first and third messages prior to reading the report, correctly identified the possible threatening interpretation of the second message without reading the report, and correctly recalled the wording of the fourth message without referring to the report, it appears that the Complainant did remember the text messages and that the Complainant used the report to refresh her recollection. The evidence does not suggest that the Complainant's memory was not refreshed as to the language of the messages or that the Complainant was merely reading from the report.

Contrary to Petitioner's position, that the Complainant recalled only the gist of some of the messages and could not recall the time and date of some of the messages prior to reviewing the report does not mean that the Complainant's enhanced ability to describe the messages after reading the report was the result of the Complainant reading directly from the report. Rather, that the Complainant could recall substantial details about the messages prior to reading the report suggests that the Complainant in fact pos-

sessed a memory of the messages that only needed refreshment via the report.

### c.

Petitioner directs this court's attention to various alleged mistakes made by Respondent that do not comport with admission of testimony under HRE Rule 612, including: (1) that the Complainant stated "[s]he was unable to 'read' the exact time because she didn't understand military time"; (2) that "[the prosecutor] specifically asked [the Complainant] for the precise words of the message and [the Complainant] improperly repeated the message word for word from the police report"; (3) that "[the prosecutor] started to ask [the Complainant] what the report said but then changed the wording of his question to suggest that [the Complainant's] memory was simply being refreshed"; (4) that [the prosecutor] stated in a bench conference that he intended to have the Complainant "come in and lay further foundation and read what the messages were[ ]"; (5) that "[o]n one occasion, the prosecutor never asked if [the Complainant's] memory was refreshed after reviewing the police report[ ]"; (6) that the Complainant stated that she "recognized" rather than "remembered" the exact words of the message when she viewed the police report; (7) that the Complainant "could no longer recall the exact words of the text messages, even though her memory had allegedly been refreshed only a short time before on direct examination"; and (8) that "there is no showing in the record that the prosecutor removed the writing from [the Complainant] after she read the report."

These arguments are not persuasive. None of these alleged mistakes by Respondent are substantial enough to effectively contravene the conclusion that may reasonably be drawn in this case that the Complainant was testifying about the messages from her refreshed recollection rather than her memory of reading the report.

### V.

### A.

As to the second question, Respondent stated that, in calling Dr. Manoukian to perform the demonstration, Respondent was attempting to rebut [Petitioner's] "accidental discharge" claim by having Dr. Manoukian demonstrate that: if a six foot tall person *could not* reach the handgun from a distance of 12–18 inches, then it is very unlikely that [the Complainant], who is [five feet and six inches tall] *could* reach it.

(Emphases in original.) At trial, "Dr. Manoukian ... was qualified as an expert in forensic pathology." According to Petitioner,

> Dr. Manoukian testified that based on his examination of photographs and x-rays of [the Complainant] that in his opinion she was shot within a distance of 12–18 inches from in front of her face. *Dr. Manoukian admitted that he had never examined [the Complainant] personally, although he testified that she was five feet six inches tall. He also testified that he himself was six feet tall. [Respondent] then had Dr. Manoukian demonstrate whether he himself could reach a gun which was within eighteen inches of his face or twelve inches of his face.*

(Emphasis added.) Petitioner noted, *inter alia*, that as to reliability of the demonstrative evidence, (1) "[a]s the [court] initially recognized there was no foundation for Dr. Manoukian to testify regarding whether [the Complainant] could reach the gun ... because Dr. Manoukian never met [the Complainant] ... [or] measured her arm length"; (2) "Dr. Manoukian conceded that the distance that gun powder can travel will vary from gun to gun"; (3) "[h]e ... testified that it would be possible to test a particular gun to determine the distance range for that particular gun but he was never asked to test the gun used during the instant shooting"; (4) thus "the basis for the demonstration he performed was unreliable and untrustworthy[,]" (citing *State v. Vliet*, 95 Hawai'i 94, 111, 19 P.3d 42, 59 (2001)).

### B.

On the other hand, Respondent argued (1) "Dr. Manoukian's ... demonstration was [ ] [ (a) ] highly relevant to the issue of whether

... the shooting was an accident; and [ (b) ] was ... demonstrative evidence in the form of an 'experiment' "; (2) "demonstrative evidence is left to the discretion of the trial court[,]" (citing *Lau*, 82 Hawai'i at 434, 922 P.2d at 1047); "[l]ikewise, the admission of experimental evidence 'rests within the sound discretion of the trial court[.]' " (quoting *Monlux v. Gen. Motors Corp.*, 68 Haw. 358, 363, 714 P.2d 930, 933 (1986)); (3) "in opening statements, [Petitioner] told the jury that the gun went off during an apparent struggle between [Petitioner] and [the Complainant]"; (4) "Dr. Manoukian['s] demonstrat[ion] that[ ] if a six foot tall person *could not* reach the handgun from a distance of 12–18 inches, then it is very unlikely that [the Complainant], who is 5'6" *could* reach it[,] ... [c]learly ... had a tendency to make [Petitioner's] claim of an 'accidental' or 'unintentional shooting' more or less probable" (emphases in original); (5) "the fact that Dr. Manoukian's arm reach may or may not have been the same as [the Complainant's] goes to the weight, not the admissibility of the demonstrative evidence [ ] ... since the live demonstration was substantially similar to Dr. Manoukian's prior unchallenged expert testimony regarding the *distance* and *trajectory* of the handgun" (emphases in original); (6) "the record is unclear as to whether or not Dr. Manoukian could or could not reach the firearm, [and Petitioner] bears the burden of demonstrating error in the record[,]" (citing *State v. Hoang*, 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000)); (7) "during the cross-examination of Dr. Manoukian, the [court] indicated the demonstration 'actually showed that he could grab the gun' "; (8) "the defense expressly abandoned the 'accidental' shooting defense, and instead, adopted an EMED defense"; (9) "assuming *arguendo* ... error [based on the foregoing (7), (8), and (9), such error] was harmless beyond a reasonable doubt[,]" (citing Hawai'i Rules of Penal Procedure (HRPP) Rule 52(a)).

### C.

■ We note that trial judges, in ruling upon the admissibility of various types of demonstrative evidence that are offered to reenact aspects of an alleged event, should insure, as Respondent concedes, that the demonstration "is to be made under conditions and circumstances similar to those prevailing at the time of the occurrence involved in the controversy[,]" (citing *Monlux,* 68 Haw. at 364, 714 P.2d at 934). We observe, however, that Respondent argues "the record is unclear as to whether or not Dr. Manoukian could or could not reach the firearm" and "[Petitioner] bears the burden of demonstrating error in the record."

■ It is not possible to discern from the record whether or not Dr. Manoukian could reach the gun when it was placed at a distance of twelve to eighteen inches away from him. Petitioner contends that the transcript of the direct examination of Dr. Manoukian by Respondent "demonstrates that Dr. Manoukian could *not* reach the gun at either 18 inches or 12 inches." (Emphasis added.) Petitioner also implies that the demonstration was harmful to his case because he posits that "the defense was forced to 'abandon' the accidental shooting defense in light of Dr. Manoukian's improper demonstration." However, Respondent notes that the court stated during a bench conference after the recross-examination of Dr. Manoukian, that the demonstration "actually showed that [Dr. Manoukian] could grab the gun."

Based on Petitioner's and Respondent's conflicting account of the demonstration and the fact that the transcript of Dr. Manoukian's testimony is not clear regarding the results of the demonstration, this court cannot determine its effect on Petitioner's case. Thus, it cannot be ascertained whether any error was harmful inasmuch as the ultimate result of the demonstration is unknown.

### VI.

As to the third question, Petitioner asserts that

[Respondent] made at least two misstatements of law during closing argument and rebuttal: (1) [the prosecutor] told the jury that they [sic] would have to decide what [the Complainant] did that entitled [Peti-

tioner] to murder her [7] and (2) *[the prosecutor] told the jury that [EMED] needed to be based on a special relationship between two people and that [Petitioner] would have to act immediately in order for this defense to apply.*

(Emphasis added.) As to item (2) above, Petitioner argues that the prosecutor misstated the law

> during his rebuttal when *he compared [Petitioner's] situation to that of a father who sees his son instantly killed by a drunk driver. The [prosecutor] drew a comparison between a father/son relationship and a married man/estranged lover relationship and then told the jury that EMED could not apply to [Petitioner] because he did not have a special relationship with [the Complainant].*
>
> . . . .
>
> Subsequently, the prosecutor again told the jury to reject the EMED defense: "Right now there's no special relationship between the married man and a single woman. It is undisputed that their relationship was dysfunctional." *Continuing to use the same comparison, the prosecutor told the jury that in the case of the father/son relationship, the father acted immediately* rather than taking "five or ten minutes to gather himself."

(Emphases added.) According to Petitioner, "it was unnecessary for the jury to find [Petitioner] had a 'special relationship' with [the Complainant] or that he acted 'immediately' in order for the EMED defense to apply." (Citing HRS § 707–702.) Thus, Petitioner asserts that "there is a reasonable possibility that these errors might have con-

tributed to the conviction," citing *State v. Maluia,* 107 Hawai'i 20, 24, 108 P.3d 974, 978 (2005), because "[Respondent] had the burden of disproving the EMED defense beyond a reasonable doubt. . : . ."

### VII.

▮▮▮▮ It is established that "[a]rguments of counsel which misstate the law are subject to objection and to correction by the court." *State v. Mahoe,* 89 Hawai'i 284, 290, 972 P.2d 287, 293 (1998) (citing *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)) (emphasis omitted). Improper statements by Respondent may serve as grounds for vacating a judgment of conviction and remanding the case for a new trial. *See State v. Wakisaka,* 102 Hawai'i 504, 516, 78 P.3d 317, 329 (2003) (holding that prosecutor's comment on defendant's failure to testify constituted plain error affecting the defendant's substantial rights); *State v. Rogan,* 91 Hawai'i 405, 415, 984 P.2d 1231, 1240 (1999) (reversing the defendant's conviction because "arguments by the prosecution contrived to stimulate racial prejudice" might have contributed to the conviction).

▮▮▮▮ In order to "determine whether reversal is required under [HRPP] Rule 52(a) [8] because of improper remarks by a prosecutor which could affect [a d]efendant's right to a fair trial, we apply the harmless beyond a reasonable doubt standard of review." *State v. Sanchez,* 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App.1996), *cert. denied,* 84 Hawai'i 127, 930 P.2d 1015 (1996) (quoting *State v. Suka,* 79 Hawai'i 293, 301, 901 P.2d 1272, 1280 (App.1995), *cert. denied,* 79 Hawai'i 341, 902 P.2d 976 (1995), *overruled* on other grounds

---

7. With respect to the first alleged misstatement, Petitioner contends that "[t]he prosecutor misstated the law when he told the jury that they [sic] would have to consider what [the Complainant] did to entitle [Petitioner] to murder her. The complaining witness's conduct is entirely irrelevant to the offense of attempted murder in the second degree or manslaughter[, and] the prosecutor's misstatement of the law may have persuaded the jury to reject a finding of extreme emotional or mental distress." (Citing HRS §§ 707–701.5 (1993) & 707–702 (1993 & Supp. 2002).)

According to Petitioner, this amounted to an instruction to "jurors that they would have to

decide what [the Complainant] did to deserve being shot in the face, even though this fact is irrelevant to the offense of attempted murder in the second degree and manslaughter." While the fact was irrelevant, this statement by the prosecutor does not appear to be prejudicial. Arguably, as Respondent claims, it was part of the prosecutor's argument "that there is nothing that [the Complainant] did that would entitle [Petitioner] to get away with murder."

8. HRPP Rule 52(a) provides as follows:

> *Harmless error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

by *State v. Holbron,* 80 Hawai'i 27, 32 n. 12, 904 P.2d 912, 917 n. 12 (1995) (other citation omitted)). *See also Miller v. State,* 712 So.2d 451, 453 (Fla.Dist.Ct.App.1998) (reversing the defendant's burglary and theft convictions where the prosecutor made improper comments pertaining to the defendant's defense of voluntary intoxication defense as "it [could not] be said that this error was harmless beyond a reasonable doubt") (citation omitted). This standard "requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. Sawyer,* 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998) (internal quotation marks and citation omitted).[9]

## VIII.

With respect to the "special relationship" and "immediacy" arguments, the transcript excerpt containing the part noted by Respondent in its answering brief is as follows:

[Prosecutor]: [Petitioner] or [Petitioner's] lawyer made a big—or talked a lot about the extreme emotional disturbance mental or the emotional disturbance instruction and how he wants to apply it in this case to that man. Does it really apply to the [Petitioner]?

Let me take you folks back. I guess this would have been on Thursday, Wednesday or Thursday when we were doing jury selection. *I think it was a Thursday and [Respondent] agreed, [Petitioner] agreed, and you all agreed with an example that [Respondent] provided for you regarding [EMED], and this had to do with a father walking his son to school and then a drunk driver comes speeding to the school zone instantly killing the son. The drunk driver gets out and starts yelling at the father blaming him for some-*

thing. *The drunk driver did and the father flips out. He loses it and he goes after the drunk driver.*

You all agreed and [Respondent] agreed and even [Petitioner] agreed that that father may be justified under the [EMED] law to go after that drunk driver. I can't imagine any of us who really are fathers not going after that drunk driver.

*Are we going to apply that special father/son and parent/child relationship to a married man/estranged lover? Does that apply or does that make sense to you?* What does your common sense tell you.

[Petitioner's Counsel]: *Your Honor, I am going to object. This is a misstatement of the law* and was not for grieving fathers who have their child run over.

THE COURT: *Counsel, it is argument.*

[Prosecutor]: Thank you, your Honor. In the drunk driver case, ladies and gentlemen, *there are a number of important facts that occurred. Once again, there's a special relationship between a father and son.* I don't think anyone can argue that their son or parent relationship is special and we are here to protect our children. *The killing by the drunk driver happened so instantly the father had no time to think. He reacted.* He flipped out. He lost it. He didn't even have five or ten minutes to gather himself. He didn't go get a loaded handgun. He just went after that drunk driver right there. The father's attack on the driver, it wasn't planned.

[Petitioner's Counsel]: *Your Honor, it doesn't have to be immediate. Another misstatement of the law. It is a different case than the one we have.*

THE COURT: *Counsel, it is argument of counsel.* He's entitled to make his argument.

---

9. Although unnecessary in this case to address the question, Petitioner asserts that these misstatements constituted prosecutorial misconduct and therefore serve as grounds for a new trial. In alleging prosecutorial misconduct, he argues a court must "consider [ (1) ] the nature of the alleged misconduct, [ (2) ] the promptness or lack of a curative instruction, and [ (3) ] the strength or weakness of the evidence against [the] defendant." *Maluia,* 107 Hawai'i at 27, 108 P.3d at

981 (quoting *State v. Agrabante,* 73 Haw. 179, 198, 830 P.2d 492, 502 (1992)) (other citation omitted). *See also Wakisaka,* 102 Hawai'i at 513, 78 P.3d at 326 (stating that "allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard ... [and f]actors considered are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant").

[Prosecutor]: No prior history between the drunk driver and the father didn't even know who the drunk driver was and the father wasn't in a public place when he attacked. The drunk driver was in a school zone where the son was murdered and run down by the drunk driver. He didn't go to the drunk driver's home, look through this window, go down the stairs and take a loaded handgun and shoot the drunk driver. There was no stalking or tracking like a hunter would. He hit him face-to-face man-to-man right there where his son was killed. That kind of man [Respondent] *would argue there is no* question that the EMED, extreme mental emotional disturbance applies in this kind of situation.

Let's look at [Petitioner's] situation, and you decide looking at [Petitioner's] situation the facts that are undisputed in this case. You decide whether these facts merit, or are you going to reward the [Petitioner] with extreme mental emotional defense—not defense, but reasonable explanation.

*Right now there's no special relationship between the married man and a single woman.* It is undisputed that their relationship was dysfunctional. Based upon alcohol, drugs, gifts, threats, text messages, phone calls, it was dysfunctional. The [Petitioner's] attack on [the Complainant] was planned.

When the [Petitioner]—I'm sorry—when the [Petitioner's] lawyer told you that the [Petitioner] walked into her unit and saw [the Complainant] and [Liburd] in bed, is that what happened? *Did he go to her house and just walk into her unit and find them in bed? Is that what [the Complainant] told you? No.*

What happened, and [Liburd] corroborates this, and he didn't even hear [the Complainant's] testimony. They both told you [the Complainant] noticed a motion light going on in her window and from the left side. You can see her bed from the right side. It is covered with the curtains. Somebody set off that motion light.

It was the [Petitioner]. [Liburd] says maybe five or ten minutes later—[the Complainant] says between two to ten minutes later the [Petitioner is] not walking into the room. He's stalking into the room with a loaded handgun.

It is not his house he's going into. It is [the Complainant's] house. It is not his room he's going into. It is [the Complainant's] room, and does a single woman have a right to be with another man? In this case [Liburd] is single. He's got children, but he's not married. Does she have a right to be with another man? Of course, she does.

We're not exactly sure when the 357 magnum revolver came into being, but the [Petitioner] did not walk to [the Complainant's] house. Just by common sense it must have been in his car, so he's already driving to [the Complainant's] house with a loaded 357 magnum in his car. Does that show some kind of planning?

*[Petitioner] will have you believe it was unexpected, he did not think about it, that [the Complainant] was with another guy, but that's not what the facts show* because two bartenders, as well as [the Complainant] and [Liburd], told you they were together in the Outback Steakhouse and at the Fish & Game. The [Petitioner] was there also. He saw them earlier.

(Emphases added.) First, Respondent contends that "[Petitioner] agreed that the . . . [second] statement was a 'fair' example of EMED." However, the transcript indicates that as to the "special relationship" and "immediacy" argument, Petitioner *did object twice* but was overruled. Secondly, Respondent contends that "as part of his closing argument [the prosecutor] repeated the trial court's proper instructions regarding EMED to the jury." According to Respondent, "[i]n utilizing the drunk driver hypothetical, [the prosecutor] was merely arguing that the nature of a particular relationship should be seriously taken into account in determining the 'reasonableness' of a defendant's conduct."

IX.

We hold that the prosecutor's argument misstated the law. It placed on Petitioner the burden of proving a special

relationship between the Complainant and Petitioner and an immediacy in the event that the law did not require. Although the court did instruct the jury as to the elements of an attempted manslaughter defense, Respondent argued in effect that such a special relationship and immediacy were necessary to establish an extreme mental or emotional disturbance for which there was a reasonable explanation. Obviously such is not the case. The jury was not disabused of this error. Because Petitioner's counsel's objections to these arguments were overruled, the jury would reasonably perceive that the misstatement of the law was not incorrect.

 If improper comments are made by a prosecutor, "harm or prejudice to [a defendant] can be cured by the court's instructions to the jury." *State v. Melear*, 63 Haw. 488, 497, 630 P.2d 619, 626 (1981). No curative instruction was given. Correlatively, the failure to correct misstatements of law by a prosecutor may result in reversal of a defendant's conviction. *State v. Gotcher*, 52 Wash.App. 350, 759 P.2d 1216, 1219 (1988) (reversing the lower court's conviction because it failed to cure the prosecutor's misstatement of the law regarding first degree burglary when it "overrul[ed] the objection [by defense counsel] and ... [did] not clarify[ ] the law to the jury").

*Gotcher* is apposite to this case. The *Gotcher* court reversed the conviction of the defendant because the lower court did not correct the prosecutor's construction of the law regarding first degree burglary. *Gotcher* explained that

> [t]he [lower] court had an opportunity to prevent confusion when defense counsel objected to the State's closing argument. The [lower] court failed to cure the misstatement by overruling the objection and by not clarifying the law to the jury. In addition, the court's referring the jury to the instructions during deliberations did not correct the error because the instructions, although they are standard [Washington Pattern Jury Instructions (WPIC)] instructions, were confusing as to whether possession of a switchblade knife is suffi-

cient to find the defendant armed with a deadly weapon.

*Id.* at 1219 (internal quotation marks and footnotes omitted).

Here, as in *Gotcher*, the court had an opportunity to clarify the law regarding the EMED defense "when defense counsel objected to the Respondent's closing argument ... [but] failed to cure the misstatement by overruling the objection and by not clarifying the law to the jury." *Id.* As Petitioner notes, this court stated in *Rogan*, 91 Hawai'i at 413, 984 P.2d at 1239, that a prosecutor's improper statements "in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office."

The instructions that were given by the court did not redress the harm caused by Respondent's misapplication of the law. While the court here did properly instruct the jury on the elements of the EMED defense in Jury Instruction No. 22, that instruction could not cure Respondent's misstatements of the law, where no specific curative instruction relating to the misstatements was given.

Similarly, despite Respondent's contention, the court's instruction to the jury in Instruction No. 3 that "[s]tatements or remarks made by counsel are not evidence" is inapposite inasmuch as the specific misstatements in question have to do with *law* and not evidence. Thus, contrary to the dissent's position, that instruction did not clarify to the jury that a special relationship between parties and immediacy of action are not required for application of the EMED defense.

Respondent also argues that the general instruction regarding a "just verdict" would preclude prejudice. Contrary to Respondent's argument, the general instruction given to the jury to "conscientiously and dispassionately consider and weigh all of the evidence and follow these instructions" was not related to the prejudicial effects of the prosecutor's assertions. Hence, no curative

instruction to specifically address and correct the misstatements was given.

### X.

Assuming, *arguendo*, that Respondent is correct in its contention that "the evidence before the jury strongly indicated that [Petitioner] was not acting under EMED or that [Petitioner's] reason for the EMED was not reasonable," it still cannot be concluded in this case that multiple misstatements of the law for which no specific curative instruction was given, was harmless beyond a reasonable doubt. There exists, at the least, "a reasonable *possibility* that the error complained of *might* have contributed to [Petitioner's] conviction," *Sawyer*, 88 Hawai'i at 329 n. 6, 966 P.2d at 641 n. 6 (emphases added), for attempted murder in the second degree as opposed to attempted EMED manslaughter.

■ The misconstruction of the law and the lack of curative instruction bore directly on Petitioner's EMED defense. Hence, the reasonable "possibility" that the error "might" have contributed to Petitioner's conviction for attempted murder rather than attempted EMED manslaughter was plainly established. *Id.*[10] However, because it cannot be said that the prosecutor's conduct was so egregious that viewed under an objective standpoint, Petitioner was denied his or her right to a fair trial, reprosecution is not barred under the double jeopardy clause. *Rogan*, 91 Hawai'i at 423, 984 P.2d at 1249 (holding that "reprosecution is barred where, in the face of *egregious* prosecutorial misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial") (emphasis added).

### XI.

Respondent cites to *State v. Kupihea*, 80 Hawai'i 307, 909 P.2d 1122 (1996), where this court held that the prosecutor's use of hypotheticals was not prejudicial to the defendant despite the defendant's allegation that one hypothetical erroneously implied that the

EMED defense required a total loss of self control. In *Kupihea*, this court recognized that several courts considering this issue have ruled that hypothetical illustrations are "arguably improper" but are not necessarily prejudicial. *Id.* at 317, 909 P.2d at 1132 (citing *People v. Pietrzyk*, 54 Ill.App.3d 738, 12 Ill.Dec. 285, 369 N.E.2d 1299 (1977); *State v. Smith*, 675 P.2d 521, 527 (Utah 1983); *People v. Wharton*, 53 Cal.3d 522, 280 Cal. Rptr. 631, 809 P.2d 290 (1991), *cert. denied*, 502 U.S. 1038, 112 S.Ct. 887, 116 L.Ed.2d 790 (1992)).

*Kupihea* is distinguishable on several grounds. First, this court held that the prosecutor there did not misrepresent the law as "[t]he prosecutor did not indicate that it was always necessary for the loss of control to be complete" for an EMED defense to apply "but rather that, in the circumstance of the hypothetical, the loss happened to be complete." *Id.* In contrast, Respondent did not indicate that the special relationship and the immediate action were not necessary conditions or that they were unique and limited to the circumstances of that specific hypothetical, but in effect argued otherwise.

The dissent argues that *Kupihea* does "not impose upon the prosecution a requirement" that it indicate to the jury that a special relationship and immediate action are not necessary elements of the EMED defense or that such conditions are limited to the hypothetical. Dissent at 151, 176 P.3d at 909. To the contrary, *Kupihea* states that a prosecutorial misstatement "warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *Id.* at 316, 909 P.2d at 1131 (internal quotation marks and citation omitted). Thus, *Kupihea* prohibits misstatements of the law that are prejudicial to the defendant. Here, unlike in *Kupihea*, the prosecutor's closing arguments erroneously suggested to the jury that certain prerequisites were necessary to the applicability of the defense, not just the instance described

---

10. The analysis in Sections VI to X, *supra*, subsumes factors of prosecutorial misconduct claimed by Petitioner inasmuch as the majority of such factors would weigh in favor of the Petitioner because the prosecutor misstated the law and no specific, curative instruction to correct the misstatements was given to the jury.

in the hypothetical. This was manifestly prejudicial to Petitioner.

Second, *Kupihea* is different in that the phrase "complete loss of control" was only stated once by the prosecution. In contrast, here, the prosecutor repeatedly used the term "special relationship" and repeatedly referred to the immediacy of the violent act throughout the rebuttal argument.

Third, the prosecutor emphasized an alleged lack of a "special relationship" between Petitioner and the Complainant and the Petitioner's lack of an immediate violent reaction to observing Complainant and Liburd together on earlier occasions. This emphasis could reasonably have led the jury to erroneously conclude that a special relationship and an immediate violent reaction to a triggering event were conditions of the EMED defense. As noted before, this was a distortion of the law, inasmuch as evidence of neither was required.

### XII.

 The crux of the dissent's position is that the prosecutor's statements regarding the "special relationship" and "immediacy" issues were not improper "because defense counsel *invited* such a response from the prosecutor." Dissent at 152, 176 P.3d at 910 (emphasis added). The dissent is incorrect. The dissent argues that "[d]efense counsel's closing argument in this case clearly and repeatedly emphasized the 'relationship' that [Petitioner] and Complainant shared." Dissent at 150, 176 P.3d at 908. In addition, the dissent maintains that "the prosecutor's 'immediacy' argument that 'the killing by the drunk driver happened so instantly the father had no time to think,' was clearly made in response to the [Petitioner's] position that 'because of [Petitioner's] state of mind upon coming upon [Complainant and Liburd] having full-on sex, he lost it.'" Dissent at 150, 176 P.3d at 908 (brackets omitted).

Contrary to the dissent's assertion, it was Respondent that first raised the "special relationship" and "immediacy" issues in voir dire and repeated them in final argument. During voir dire, in explaining the EMED defense the prosecutor introduced the hypothetical involving a father who experiences EMED upon seeing his son killed by a drunk driver:

> Now, you can imagine, *those of us who are fathers, you know, how we would feel if the son gets run down right in front of your eyes.* ...
>
> . . . .
>
> The father at that time ... is under extreme mental or emotional disturbance, which means he flips out. He loses it. And he goes and he attacks the drunk driver. I mean, he just plows into him.
>
> . . . .
>
> ... We all feel that way don't we? I mean, it's just—it's something that happened instantaneously.
>
> . . . .
>
> Okay. That, ladies and gentlemen, I would submit to you, would be the example I have for the [EMED] or flipping out or losing it....
>
> . . . .
>
> ... He just lost it. *It's something that happened so quick, there's no waiting period; there's no time for him to gather his thoughts or calm himself. He just reacts to an immediate situation.* ...

(Emphases added.)

Thus, the prosecutor introduced the issue of a "special relationship" in the context of the EMED defense when he used a father and son in his hypothetical during voir dire and asked the fathers in the jury to imagine how they would feel if their son was run down. Similarly, the prosecutor introduced the proposition of "immediacy" when he stated that "there is no waiting period" and that there is an immediate reaction to witnessing a stressful event.

During the prosecutor's closing argument and before the defense counsel gave his closing argument, the prosecutor reintroduced the discussion of a close relationship as necessary to the EMED defense. The prosecutor stated in closing argument, "How many jealous married husbands are there that's going after their ex-lovers and shooting them in the face? Is that a reasonable explanation? Is that reasonable to you?" Thus, the

prosecutor's closing argument asserted that the particular relationship between Petitioner and Complainant, of a married man and an ex-lover, could not give rise to the EMED defense.

The foregoing demonstrates that the prosecutor's misstatements regarding the "special relationship" and "immediacy" issues were *not made upon invitation* by Petitioner during Petitioner's closing argument. Rather, the prosecutor's misstatements pertaining to these issues were made before Petitioner's closing argument as they were made during voir dire and during the Respondent's closing argument. Furthermore, contrary to the dissent's assertion, Petitioner's counsel confined his argument to the facts and evidence presented, as it exemplified the jealousy of a jilted lover that culminated in a violent reaction.

In rebuttal the prosecutor again raised the "special relationship" and "immediacy" issues when he referred back to his voir dire example of a father witnessing an accident in which his son was involved:

> Let me take you folks back. I guess this would have been on Thursday, Wednesday or Thursday when we were doing jury selection. *I think it was a Thursday and [Respondent] agreed, [Petitioner] agreed, and you all agreed with an example that [Respondent] provided for you regarding [EMED], and this had to do with a father walking his son to school and then a drunk driver comes speeding to the school zone instantly killing the son. The drunk driver gets out and starts yelling at the father blaming him for something. The drunk driver did and the father flips out. He loses it and he goes after the drunk driver.*

> You all agreed and [Respondent] agreed and even [Petitioner's] defense agreed that that father may be justified under the [EMED] law to go after that drunk driver. I can't imagine any of us who really are fathers not going after that drunk driver.

> *Are we going to apply that special father/son and parent/child relationship to a married man/estranged lover? Does that*

*apply or does that make sense to you? What does your common sense tell you.*

(Emphases added.)

Accordingly, the dissent's argument that "no curative instruction was needed in light of defense counsel's portrayal of the facts of this case in his closing argument" Dissent at 149, 176 P.3d at 907, is wrong in view of the fact that Respondent initiated these propositions in voir dire and repeated them in its closing argument. Hence, the dissent's reliance on *State v. Clark*, 83 Hawaiʻi 289, 305, 926 P.2d 194, 210, *reconsideration denied*, 83 Hawaiʻi 545, 928 P.2d 39 (1996), which held the prosecutor may "respond to comments by defense counsel which invite or provoke a response" and "denounce the activities of defendant and highlight the inconsistencies in defendant's argument," is not controlling.

As indicated previously, it was Respondent that introduced the "special relationship" and the immediacy argument into the case. Second, the aforementioned holding in *Clark* does not authorize a prosecutor to misapply the law. As related in Section VIII, the prosecutor misstated the law by telling the jury that a "special relationship" like that between a father and son must exist between Petitioner and Complainant in order for the EMED defense to apply. The prosecutor also misstated the law by asserting that Petitioner should have had an immediate violent reaction at the first instance of seeing Complainant with Liburd. These statements by the prosecutor went beyond a mere response to any statements made by defense counsel, but constituted an erroneous definition of the law.

## XIII.

Based on the foregoing, we affirm in part the ICA's July 5, 2007 judgment issued pursuant to its May 31, 2007 Summary Disposition Order with regard to the ICA's holding that Complainant's testimony on the text messages was properly admitted, do not reach the question of Dr. Manoukian's demonstration, but vacate the ICA's judgment insofar as it adjudged that there was no error in Respondent's closing argument as to the EMED defense. The case thus is re-

manded for a new trial on Counts 1 and 2. Petitioner not having challenged Count 3 in his Application, the ICA's judgment is affirmed as to Count 3.

### Dissenting Opinion by NAKAYAMA, J.

I respectfully dissent. We have long held that argument by counsel is not evidence, and in this case, the prosecutor's rebuttal merely responded to defense counsel's closing argument.

The majority concludes that "the prosecutor's [closing] argument misstated the law" because "[i]t placed on Petitioner the burden of proving a special relationship between the Complainant and Petitioner and an immediacy in the event that the law did not require." Majority opinion at 143, 176 P.3d at 901. The majority continues:

> Although the court did instruct the jury as to the elements of an attempted manslaughter defense, Respondent argued in effect that such a special relationship and immediacy were necessary to establish an extreme mental or emotional disturbance for which there was a reasonable explanation. Obviously such is not the case. The jury was not disabused of this error. Because Petitioner's counsel's objections to these arguments were overruled, the jury would reasonably perceive that the misstatement of the law was not incorrect.

Majority opinion at 143, 176 P.3d at 901.

Because a determination of whether the prosecutor misstated the law requires an examination of the words used by the parties, I will begin by quoting the relevant portions of the trial proceedings. After reserving time for rebuttal, the prosecutor said the following in his closing argument:

> [PROSECUTION]: ... [Jury] Instruction Number 22, this is where the law gets a little confusing, ... because if you find that the defendant is guilty beyond a reasonable doubt of Attempted Murder, then you have to move onto this instruction here. If you find that he is not guilty of Attempted Murder, then you don't consider the Attempted Manslaughter. That's how the law is and I'll explain that in a moment here.

If and only if you unanimously find that all of the elements of Attempted Murder in the Second Degree have been proven by the prosecution beyond a reasonable doubt, then you must consider whether at the time defendant attempted to cause the death of Christine E. Dietz he was under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation.

The reasonableness of the explanation shall be determined from the viewpoint of a person in defendant's situation under the circumstances of which defendant was aware, or as the defendant believed them to be. Again, that is a handful to try to break down and really understand what that means. I will try to explain it right now in as best terms as I can.

What that means is if you find that defendant is guilty, that the [prosecution] has proven him guilty of Attempted Murder in the Second Degree, then you need to ask yourself was he under the influence of extreme mental or emotional disturbance for which there's a reasonable explanation. You need to ask yourself that.

Again, if you don't find him guilty of attempted murder, then you don't ask yourself that. If you do, then you have to ask yourselves this. It gives you a definition of what reasonableness is. The reasonableness of the explanation shall be determined from the viewpoint of the person in the defendant's situation. In other words, you don't gauge how reasonable it is by what the defendant did. We know what he did. He shot her in the face. You have to put another person in the defendant's position and see what would another person under that circumstances, what would he do.

*How many jealous married husbands are there that's going after their ex-lovers and shooting them in the face? Is that a reasonable explanation? Is that reasonable to you? That is what you need to determine. If you find that's not reasonable, then the defendant is not entitled to the extreme mental emotional disturbance which there's a reasonable explanation. He's not entitled to this and you must find*

him guilty of *Attempted Murder in the Second Degree.*

Now, I need to tell you if you are unable to reach a unanimous agreement as to Attempted Murder in the Second Degree and you can't reach a unanimous agreement as to Manslaughter in the Second Degree, then you can't reach an agreement and you can find guilt or not guilty for either charge, but based upon the evidence that the [prosecution] has presented during this past week and a half, ... I would argue to you that the evidence is overwhelming. I can't see—I can't give you my opinion, but based upon the evidence it is overwhelming and you must look at the evidence that was presented.

(Emphasis added.)

Subsequently, defense counsel said the following in his closing argument:

[DEFENSE COUNSEL]: ... [Extreme mental or emotional disturbance] basically requires that you find unanimously that the defendant was under extreme mental or emotional disturbance for which there's a reasonable explanation from the point of view of a person in [the defendant's] position.

*Now, [the defendant's] position was he walked in on his recent girlfriend's room and found her ... screwing Derek Liburd.* It is not that he was a jealous guy going back when he saw that happening that had a great effect on him. I ask you to look into your common sense. We're not talking about a video, movies or a magazine. *When people walk in on someone that they still care about and they are having sex with someone else, it can be a very, very disturbing experience.*

In order to find extreme emotional disturbance you will have to all agree ... that the circumstances [the defendant] found himself in were for a person in his position would be understandable. Reasonable doesn't mean right. Reasonable doesn't mean it justifies it. Reasonable just means that you can understand it.

... *What we're claiming is because of [the defendant's] state of mind upon coming upon these two having full-on sex, he lost it.*

. . . .

... [S]o extreme mental emotional distress is not about losing control in the sense that you might go shishi in your pants or that you might fall on the floor because you can't walk anymore. That's physical control. We are talking about mental control. *Was the stress or stimulus enough to reduce his culpability from murder to manslaughter?*

(Emphases added.)

To illustrate the defendant's position that "he lost it" when he "[came] upon these two having full-on sex," defense counsel posited the following to the jury:

[DEFENSE COUNSEL]: Let's look at what was really going on. *What do guys trying to get a relationship going do?* They help you know cook a few meals, go over to have a few meals, and if the person interested in likes champagne, they might bring some. If the person likes detective novels, they might bring some, and if the person likes cocaine, the guy might bring some. Doesn't make it right. Just what people do. Sending flowers, that's the kind of thing guys do when they're trying to get something going. Guys tend to think flowers are important to a woman. It is hard to say whether that is really true. Go to the hot tub, sure. Buy some groceries. Who wouldn't? This is the kind of thing a lot of guys do and there's nothing particular sinister about it.

You know, guys take the person they are trying to get together with to the Lodge at Koele even if it was just a kamaaina room.... I suppose guys take girls out on dates to movies and shows. I suppose they go to this and that, go out to dinner. In this case there might have been two dinners.... I think that shows what Miss Dietz was interested in.

(Emphasis added.)

Accordingly, defense counsel argued that the defendant was under EMED at the time of the shooting, as follows:

[DEFENSE COUNSEL]: Now at this point I'd like to discuss the signs of extreme emotional or mental disturbance in [the defendant], the signs that could make

you think that it actually is true, that you could understand it is true.

[The defendant] shouldn't have been walking into her apartment, *but there's no evidence he thought they would be going at it on the bed like they were. Seeing people you care about actually having sex is very upsetting to many people.*

The evidence that I saw indicates that [the defendant] shot Christy. . . . *If [the defendant] had a cold-blooded plan, a cold-blooded plan, he had plenty of bullets to put a couple more in her and still shoot himself, but this wasn't planned as indicated* [.]

[W]ouldn't you agree that for a person to shoot themselves as opposed to anyone else, that's a strong sign that person is under some kind of extreme emotional or mental disturbance. *It is one thing to go somewhere and shoot a person or shoot them three times until they are dead and leave. That could be cold-blooded. Maybe yes, maybe no. It is a different case. . . . Most people don't shoot themselves when they are feeling calm and cold and you can ask yourself from your experience whether that is right.*

. . . .

*You heard no testimony about any prior physical abuse of Miss Dietz.* No fighting, no pushing her around. You did hear testimony about one verbal altercation that happened in November. That's all they could come up with because there hasn't been any. There hasn't been any physical abuse. There has not be any disorderly conduct. As Miss Dietz told you, there has not been any TRO. There hasn't been any anything, and sometimes in *abusive relationships* that culminate in violence you can see an escalating pattern, verbal abuse, physical abuse, . . . injury or death. This has happened on Maui a few times. *That's not what we are looking at here. It didn't happen that way.*

It seems very likely that . . . [the defendant] was under extreme emotional or mental disturbance at that time based upon where he was coming from. . . . Is it a reasonable explanation? Well, not if you are in a court of law trying to be found not guilty, *but it is a reasonable explanation in terms of human behavior, hot blood crime of passion from the point of view of [the defendant] and the circumstances where he walks in on these two.*

Let's talk about Miss Dietz for a little bit. . . . Parts of her testimony were just simply not believable.

. . . .

Did [the defendant] bring the . . . beer during or after your *intimate relationship?* Don't recall[.]

. . . .

What quality did you see in [the defendant] that made you want to *change from friends to lovers?* Well, no one quality. I like him. I thought he was a nice guy.

. . . .

In order to continue to get drugs and the other benefits it is necessary for the person, the chump to think there's a *relationship* going on. I think you understand what I mean. If it is real clear that nothing is happening, people get discouraged. The fact is Christy had to lead [the defendant] on for him to continue taking care of her business for her. Now, that's fine, but again that's how [the defendant] . . . could think he had a *relationship* with this woman. Well, he did have a *relationship.* She's a user. He's a chump, but I don't think that's a *relationship.*

*It is unlikely that's the relationship [the defendant] thought he was having back then. [The defendant] thought he had a girlfriend . . . . period.*

(Emphases added.)

The majority quotes the prosecutor's rebuttal to the defendant's closing argument, majority opinion at 146, 176 P.3d at 904, and points out that the defendant objected to the prosecutor's " 'special relationship' and 'immediacy' argument," but was overruled and "[n]o curative instruction was given." Majority opinion at 146, 176 P.3d at 904. In my view, no curative instruction was needed in light of defense counsel's portrayal of the facts of this case in his closing argument, as quoted above, and the prosecutor's rebuttal thereto.

With regard to the issue of whether there has been any misstatement of the law in the prosecutor's rebuttal, this court has indicated in *State v. Rogan,* 91 Hawai'i 405, 413, 984 P.2d 1231, 1239 (1999) that "[p]rosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office." However, this court has explained:

> With regard to the prosecution's closing argument, a prosecutor is "permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence." *Quitog,* 85 Hawai'i at 145, 938 P.2d at 576 (quoting *State v. Clark,* 83 Hawai'i 289, 304, 926 P.2d 194, 209, *reconsideration denied,* 83 Hawai'i 545, 928 P.2d 39 (1996) (citations omitted)). In other words, closing argument affords the prosecution (as well as the defense) the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom. *Quitog,* 85 Hawai'i at 145, 938 P.2d at 576.

*Id.* at 412–13, 984 P.2d at 1238–39. This court has also quoted with approval that the prosecutor may not only "base its closing argument on the evidence presented or reasonable inference[s] therefrom," but also *"respond to comments by defense counsel which invite or provoke a response,"* as well as *"denounce the activities of defendant and highlight the inconsistencies in defendant's argument."* *Clark,* 83 Hawai'i at 305, 926 P.2d at 210 (quoting *People v. Sutton,* 260 Ill.App.3d 949, 197 Ill.Dec. 867, 631 N.E.2d 1326, 1335 (1994)) (quotation marks omitted) (emphasis added); *see State v. Mars,* 116 Hawai'i 125, 142, 170 P.3d 861, 878 (App. 2007) ("Prosecutors have latitude to respond in rebuttal closing to arguments raised by defense counsel in their closing."). Accordingly, although "[a]rguments of counsel

which misstate the law are subject to objection and to correction by the court[,]" *State v. Mahoe,* 89 Hawai'i 284, 290, 972 P.2d 287, 293 (1998) (citation, block format, and emphasis omitted), it has been said that "whenever the argument of defense counsel invites or provokes a response on the part of the prosecutor, defendant then cannot complain that he has been prejudiced by such a response." *People v. Reyes,* 131 Ill.App.2d 134, 266 N.E.2d 539, 544 (1970).

In the instant case, defense counsel's closing argument before the jury and the prosecutor's rebuttal thereto seem to dispute the reasonableness of a person's response to a given, but sudden, situation. As quoted above, defense counsel framed his closing argument around the issue of whether there exists "a reasonable explanation *in terms of human behavior*" sufficient to reduce attempted murder in the second degree to attempted manslaughter. (Emphasis added.) Defense counsel's closing argument in this case clearly and repeatedly emphasized the "relationship" that the defendant and Complainant shared. In so arguing, defense counsel attempted to paint a colorful picture for the jury that described an "intimate relationship" in order to emphasize that what the defendant did was a "hot blood crime of passion from the point of view of [the defendant]," and not simply a "cold-blooded plan." Consequently, the defendant's position appears to be that "because of [the defendant's] state of mind upon coming upon these two having full-on sex, he lost it."

The prosecutor responded to defense counsel's argument by drawing a hypothetical comparison between jealous lovers and a father who witnesses his own child being killed by a drunk driver. According to the prosecutor's hypothetical in his rebuttal, "[t]he killing by the drunk driver happened so instantly the father had no time to think. He reacted. He flipped out. He lost it." Comparatively, as the prosecutor argued in its closing argument, "[h]ow many jealous married husbands are there that's going after their ex-lovers and shooting them in the face? Is that a reasonable explanation?"

In this regard, I would distinguish *State v. Kupihea*, 80 Hawai'i 307, 909 P.2d 1122 (1996), differently than the majority. *See* Majority opinion at 144–45, 176 P.3d at 902–03. As the majority observes, "[i]n *Kupihea*, this court recognized that several courts considering this issue have ruled that hypothetical illustrations are 'arguably improper' but are not necessarily prejudicial." Majority opinion at 144–45, 176 P.3d at 902. However, the majority distinguishes *Kupihea* from the instant case in the following ways: (1) "Respondent did not indicate that the special relationship and the immediate action were not necessary conditions or that they were unique and limited to the circumstances of that specific hypothetical, but in effect argued otherwise"; (2) unlike in this case, "the phrase 'complete loss of control' was only stated once by the prosecution" in *Kupihea*; and (3) the prosecutor misstated the law, "inasmuch as evidence of neither" a "special relationship" nor "an immediate violent reaction" was required. Majority opinion at 144–45, 176 P.3d at 902–03.DP1As to the majority's first point, I do not read *Kupihea* to apply in the same way as the majority has applied it. This court stated in *Kupihea* that

> Kupihea argues that "it is error to say the mental or emotional disturbance must result in the total loss of self-control." However, taken in context, we do not believe that is what the prosecutor said. The prosecutor did not indicate that it was always necessary for the loss of control to be complete, but rather that, in the circumstance of the hypothetical, the loss happened to be complete.

1. The following is the excerpt of the prosecutor's closing argument in *Kupihea*:

> [The PROSECUTOR]: For example, this is just a hypothetical, but you maybe have a battered wife, repeatedly—
> [Defense objection, overruled]
> [The PROSECUTOR]: We have someone who is a battered wife, repeatedly abused. Say she gets abused one last time. Last straw. She gets beaten. And she lashes back. She is suffering from, in this particular instance, an extreme mental or emotional disturbance. There is [sic] extreme circumstances, she lashes back, grabs a knife in the kitchen, and she starts stabbing, boom, boom, boom, boom.
> [Defense objection.]

80 Hawai'i at 317, 909 P.2d at 1132. Reading the excerpt [1] from the prosecutor's closing argument in *Kupihea* together with what this court stated reveals that this court did not impose upon the prosecution a requirement that it must "indicate that the special relationship and the immediate action were not necessary conditions or that they were unique and limited to the circumstances of that specific hypothetical[.]" Majority opinion at 144, 176 P.3d at 902. Instead, this court simply addressed the defendant's argument that "it is error to say the mental or emotional disturbance must result in the total loss of self-control[,]" and ultimately concluded that the prosecutor's closing argument was construed by the court in a different way than what the defendant was asserting. *Kupihea*, 80 Hawai'i at 317, 909 P.2d at 1132.

As to the majority's second and third points, it is clear from context that the prosecutor's hypothetical in this case was made in response to defense counsel's analogy between a "hot blood crime of passion" and a "cold-blooded plan," as well as his colorful description of the "intimate relationship" the defendant and Complainant shared. At the conclusion of the hypothetical, the prosecutor drew an analogy between its "example" and the case at bar to persuade the jury that defense counsel's comparison between a "hot blood crime of passion" and a "cold-blooded plan" was not a reasonable explanation.

Moreover, the prosecutor's "immediacy" argument that "[t]he killing by the drunk driver happened so instantly the father had no time to think[,]" was clearly made in response to the defendant's position that "be-

> THE COURT: Counsel, I believe in giving pretty much wide discretion with the attorneys during their closing arguments. Let's, of course, remind the jury that what the attorneys are saying is not evidence. Objection is overruled.
> [The PROSECUTOR]: In that instance, there may be a reasonable explanation for her state of mind, the extreme mental and emotional disturbance. In that instance, you might mitigate the murder. *A complete loss of control, self-control.*
> [DEFENSE COUNSEL]: Your Honor, I'll object. That misstates the law.
> 80 Hawai'i at 317, 909 P.2d at 1132 (emphasis and alterations in original).

cause of [the defendant's] state of mind upon coming upon these two having full-on sex, he lost it." Finally, even though the prosecutor said the words "special relationship" several times in its rebuttal, defense counsel's closing argument largely focused on describing the "intimate relationship" that the defendant and Complainant shared. Therefore, taken in context with the analogy that defense counsel posited to the jury during his closing argument, I can find no statements in the prosecutor's rebuttal that substantially prejudiced the defendant's right to a fair trial.

I also note that immediately prior to closing arguments, the circuit court instructed the jury, as follows:

> [THE COURT]: ... Again, ladies and gentlemen, what the attorneys say is not evidence in the case. That does not mean you should disregard what they are telling you. Obviously, they are presenting their summation of what they believe the facts are in this case and what those facts indicate to you in the light most favorable to each of their positions, and often what the attorneys say is helpful to the jury in helping them understand, in comprehending the evidence which they have seen so far.

The defendant made two objections during the prosecutor's rebuttal, which the circuit court overruled, as follows: "Counsel, it is argument[,]" and "Counsel, it is argument of counsel. He's entitled to make his argument." In my view, this is clearly consistent with the court's prior instruction to the jury. Having heard the closing arguments and rebuttal of both counsel, the trial court put everything logically in context and ruled correctly.

Accordingly, I would hold that the defendant's assertion is without merit because defense counsel invited such a response from the prosecutor. *See Clark*, 83 Hawai'i at 305, 926 P.2d at 210.

For the foregoing reasons, I would affirm the ICA's July 5, 2007 judgment, which affirms the second circuit court's May 18, 2005 amended judgment of conviction.